**DUPONT CIRCLE CITIZENS ASSOCIATION, Petitioner,**

**v.**

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**and**

**Coordination Council for North American Affairs, Intervenor,**

**and**

**United States Department of State, Intervenor.**

No. 86–1105.

District of Columbia Court of Appeals.

Argued June 16, 1987.
Decided Sept. 11, 1987.

---

Richard B. Nettler, with whom Geoffrey P. Gitner, Washington, D.C., was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom James R. Murphy, Acting Corp. Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the memorandum in lieu of brief, for respondent.

Thomas G. Corcoran, Jr., with whom James H. Rowe III, Washington, D.C., was on the brief, for intervenor Coordination Council for North American Affairs.

John P. Schnitker, U.S. Dept. of Justice, with whom Abraham D. Sofaer, U.S. Dept. of State Legal Advisor, Elizabeth G. Verville, U.S. Dept. of State Deputy Legal Advisor, Bruce Rashkow, Morton J. Holbrook III, and Ronald S. Mlotek, U.S. Dept. of State, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Michael Jay Singer, U.S. Dept. of Justice, Washington, D.C., were on the brief, for intervenor U.S. Dept. of State.

Before PRYOR, Chief Judge, and FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

The Dupont Circle Citizens Association appeals an order of the Board of Zoning Adjustment (BZA or Board) approving a variance and special exception that would allow the Coordination Council for North American Affairs (CCNAA) to operate offices for its Defense Procurement Division in a building located at 1701 18th Street, N.W. We agree with the Citizens Association that the Board erred when it concluded that it need not treat CCNAA's application as if it were for a chancery use. We therefore must reverse and remand for further proceedings.[1]

## I.

On September 24, 1985, the National Parks and Conservation Association filed an application for a "special exception ... to change a nonconforming use of offices to [a] chancery with a variance from the prohibition against permitting in residential districts a proposed use that is not a neighborhood facility." [2] BZA Order at p. 1; *see* 11 DCMR § 2003 (1986). The Conservation Association sought this relief to allow CCNAA, the contract purchaser of its prop-

---

1. In light of this disposition we need not address the Citizens Association's other contentions. We note for the record, however, that the Association challenges the BZA's determination that CCNAA did not constitute a "public international organization" within the meaning of the zoning regulations. 11 DCMR § 199 (1986). The Association also claims the Board erred in granting a variance from the requirement that CCNAA's proposed use qualifies as a "neighborhood facility" within the meaning of the zoning regulations; failed to take into account the now adopted Land Use Element of the District of Columbia Comprehensive Plan, *see* D.C.Code §§ 1-245 & -246 (1987 Replacement); improperly restricted cross-examination of CCNAA's witnesses; and failed to provide proper notice of the actual nature of CCNAA's application. We express no views on these assertions.

2. Before filing this application the Conservation Association, as well as CCNAA and the State Department, had attempted to go directly to the BZA under the Foreign Missions Act, 22 U.S.C.A. § 4306 (1987 Supp.); D.C.Code § 5-1206 (1987

Supp.), and the local zoning regulations, 11 DCMR §§ 1000 to 1002 & 1099 (1986). The District of Columbia zoning authorities, however, apparently took the position that the BZA could not process a chancery application for a location not within the Diplomatic ("D") "overlay" zoning districts. CCNAA, therefore, applied to the Zoning Commission for a map amendment from R-5-B to D/R-5-B. In response to a staff report opposing the application, the National Capital Planning Commission (NCPC) intervened and recommended that the matter be taken directly to the BZA. NCPC also opined that CCNAA's application was not consistent with the Foreign Missions Act because the location was not within an area designated for chancery facilities. In light of these conflicts among various agencies as to the correct procedures, CCNAA obtained postponement of a scheduled September 23, 1985 hearing before the Zoning Commission and filed directly with the BZA the application at issue in this appeal.

erty at 1701 18th Street, N.W.,[3] to locate offices there. The property is rectangular in shape and improved with a four-story red brick structure that occupies approximately 85% of the lot's 4,884 square feet. It is located within the Dupont Circle Historic District and zoned R–5–B. *See* 11 DCMR § 105.1(a)(5)(B) (1986). Although originally built as a single family mansion at the turn of the century, the property has been used for nonprofit office purposes for approximately 40 years. In 1967, the Board approved a change in nonconforming use from offices of the Disabled American Veterans to offices of the National Parks and Conservation Association. BZA Order at ¶ 11; *see also* BZA Order No. 9373 (November 6, 1967). The Conservation Association subsequently obtained BZA approval to lease parts of the building to other nonprofit organizations. BZA Order at ¶ 12.

The contract buyer, CCNAA, is "the unofficial instrumentality established by the people on Taiwan having the necessary authority under the laws applied by the people on Taiwan to provide assurances and take other actions on behalf of Taiwan in accordance with the [Taiwan Relations] Act [22 U.S.C.A. §§ 3301 *et seq.* (1987 Supp.)]." Exec. Order No. 12143, 44 C.F.R. 37191 (1979), *reprinted in* 22 U.S.C.A. § 3301 note, at 124–25 (1987 Supp.). It is organized as a not-for-profit corporation under the laws of Taiwan. CCNAA's counterpart in Taiwan is the American Institute in Taiwan (AIT). It was established by the Taiwan Relations Act as the designated entity through which "[p]rograms, transactions, and other relations conducted or carried out by the President or any agency of the United States Government with respect to Taiwan," 22 U.S.C.A. § 3305(a) (1987 Supp.), could be accomplished without any appearance of formal diplomatic relations.

The United States Department of State attached a letter of support, dated September 13, 1985, to the Conservation Association's September 24 application to the BZA. In this letter, the State Department took the position that, "[p]ursuant to the Taiwan Relations Act, it is the view of this Department that the Coordination Council for North American Affairs should be treated as a chancery within the meaning of the Zoning Regulations of the District of Columbia." In the same letter, the Department also asked the BZA to confirm that the application could be processed pursuant to the zoning regulations generally governing changes from one nonconforming use to another nonconforming use. *See* 11 DCMR §§ 2002 to 2005 (1986). The State Department received confirmation from the Zoning Administrator that the application would be treated in that way.[4]

One week after the application had been filed, CCNAA and the Conservation Association moved to expedite the procedures before the BZA because of time limits in the contract between the two organizations. Although the BZA scheduled a public hearing for late November 1985, CCNAA requested a postponement because Colonel Lung Hsia, Deputy Director of the Defense Procurement Division, was unable to attend. Hearings actually began on January 22, 1986 and were concluded on January 27.

At the January 22 hearing, Ronald Mlotek, Chief Counsel of the Office of Foreign Missions of the Department of State, outlined the Department's understanding as to whether the Board was permitted, or even was obliged in any way, to treat CCNAA's application as if it were for a chancery use. He testified unequivocally that the "only way" a premises can obtain the legal status of a chancery is through notification to the State Department coupled with the Department's acceptance or recognition. He further stated that, because the State Department had taken no such action with respect

---

**3.** "The property is located at the northeast corner of the intersection of 18th and R Streets, N.W." BZA Order at ¶ 8.

**4.** The Department's letter, however, reflects an inherent contradiction. As all parties now agree, if CCNAA is to be treated as a chancery for purposes of the zoning regulations, as we hold it must be, its application would have to be considered by a BZA, *see infra*, note 14, applying only the substantive provisions of the Foreign Missions Act, *see* 22 U.S.C.A. § 4306 (1987 Supp.); D.C.Code § 5–1206 (1987 Supp.); 11 DCMR §§ 1000 *et seq.* (1986), rather than the generally applicable zoning regulations.

to CCNAA, the premises in question were "not a chancery." He added, however, that

> CCNAA has an election—an option. It may do either. It may—if it wishes, it has the right under U.S. law, namely, the Taiwan Relations Act and the executive orders and agreements that were promulgated pursuant to the Act. CCNAA has the right to request to be treated as if it were a chancery under the zoning procedures of the District of Columbia, but it doesn't have to do that.

He summarized the State Department's position as follows:

> We take the position that CCNAA is entitled to elect whichever treatment it wants because, technically speaking, under the laws of the District of Columbia and under international law and under U.S. law, Federal law, CCNAA is not a chancery. There is no way you can make them a chancery because we don't have diplomatic relations.[5]

The next day, Mlotek submitted a letter to the BZA again setting out the Department of State's position. This letter was submitted in response to a request from the Office of Planning that the State Department provide written certification that the Department believed CCNAA could not have a chancery as defined in the Foreign Missions Act. Mlotek reiterated that the Department does not recognize CCNAA's premises as a chancery as defined by the Foreign Missions Act. The letter continued:

> Rather, what we have argued is that, for District zoning law purposes only, CCNAA premises are entitled to the same treatment accorded chanceries, in recognition of CCNAA's unique status under U.S. law. This distinction is subtle, but it is a most important one.
>
> I would also like to clarify for the record that, while CCNAA premises are

*eligible* to receive the same zoning treatment accorded chanceries, we have no objection to CCNAA zoning applications being treated pursuant to the ordinary zoning laws of the District, as distinct from the provisions under the Foreign Missions Act. This presupposes, of course, that CCNAA itself opts for the non-Foreign Missions Act zoning treatment.

(Emphasis in original). He added that this position "is consistent with the view stated in the [September 13, 1985] letter," which he characterized as stating that CCNAA "should be treated as a chancery within the mea[n]ing of the District's zoning laws," but not "going so far as to declare that such offices do, in fact, constitute a chancery."

### II.

In determining that CCNAA's application was not, in fact, for a chancery use, the Board relied almost exclusively on the absence of formal diplomatic relations between the United States and Taiwan:

> The Zoning Regulations define a chancery as "the principal offices of a foreign mission used for diplomatic or related purposes ..." [11 DCMR § 199.9 (1986)] The critical element in this definition is the requirement for diplomatic related purposes based on the definition and according to the Department of State. The Board finds that the CCNAA does not enjoy the status of established diplomatic relations with the United States and, therefore, does not meet the definition of a chancery.

BZA Order at ¶ 19. The Board also specifically noted its understanding of the State Department's position: although "[t]he Department of State does not consider the CCNAA to be a chancery, ... in their view, it might be treated as such under the Zoning Regulations." *Id.* at ¶ 18.[6] In light of

---

5. Andrea Johnson, consultant to the BZA, noted at this point the distinction between "making" CCNAA's premises a chancery and treating them as a chancery for zoning purposes: "We're not talking about making them, we're talking about how they are to be treated, okay, and it may be a semantic difference, but for our purposes in

terms of how ... the Board applies the criteria, it is useful...."

6. The remainder of this paragraph reads: "The Department officially views the relations between the People of Taiwan and the United States as unique, and there is no other entity

its conclusion that CCNAA did not meet the definition of a chancery, the BZA treated its application as one for general office use. *Id.* at ¶ 22.[7]

The Citizens Association argues that the Board's interpretation of the zoning regulations is "clearly erroneous and at odds with the intent of the Zoning Regulations, the Taiwan Relations Act and the Foreign Missions Act." In reviewing the BZA's interpretation of the Zoning Regulations, "[w]e must affirm such legal conclusions if they rationally flow from findings of fact supported by substantial evidence in the record as a whole." *Draude v. District of Columbia Board of Zoning Adjustment,* 527 A.2d 1242, 1250 (D.C.1987) (citations omitted). We agree with the Citizens Association, however, that the Board's analysis cannot withstand scrutiny. In relying on the State Department's reasoning and in focusing on the absence of diplomatic relations between the United States and Taiwan, the BZA failed to take into account the mandate of the Taiwan Relations Act, which requires—not merely permits—treatment of CCNAA's application under the same substantive provisions of law that would apply if CCNAA were entitled, officially, to a chancery use.

### A.

■ We begin our analysis of the Board's conclusion by examining the term "chancery." The zoning regulations define chancery as "the principal offices of a foreign mission used for diplomatic or related purposes, and annexes to the offices (including ancillary offices and support facilities), including the site and any building on the site which is used for diplomatic or

related purposes." 11 DCMR § 199.9 (1986); *see also* 22 U.S.C.A. § 4302(a)(2) (1987 Supp.) (substantially identical definition of chancery contained in Foreign Missions Act). In light of this definition, it is apparent that the question whether CCNAA's proposed office use must be treated as a chancery turns, initially, on an interpretation of the term "foreign mission." The zoning regulations themselves do not define this term. It is defined, however, in the Foreign Missions Act, which is codified at 22 U.S.C.A. §§ 4301 *et seq.* (1987 Supp.), and at D.C.Code §§ 5–1201 *et seq.* (1987 Supp.).

The Foreign Missions Act is relevant not only because it defines a critical term but also because it establishes the procedures through which zoning decisions concerning chanceries are to be made. One section specifically sets forth the considerations to be taken into account for the "location, replacement, or expansion of chanceries in the District of Columbia." 22 U.S.C.A. § 4306 (1987 Supp.); D.C.Code § 5–1206 (1987 Supp.).[8] Without dispute, these provisions preempt any otherwise applicable zoning regulations.

A close examination of the Foreign Missions Act reveals that the Act does not compel a conclusion that CCNAA must be treated as if it were a chancery. The Citizens Association claims that the term foreign mission includes CCNAA because that term incorporates unofficial delegations from other nations. The Foreign Missions Act defines a "foreign mission" as

any mission to or agency or entity in the United States which is involved in the diplomatic, consular, or other activities of, or which is substantially owned or

with which the United States conducts its affairs in a similar manner. The Department of State reasoned that the CCNAA zoning application would be eligible to receive the same zoning treatment accorded to chanceries; nevertheless, the Department of State interposed no objection to the CCNAA being treated as a general office use pursuant to the ordinary zoning laws of the District of Columbia." BZA Order at ¶ 18.

7. In reaching its conclusion, the BZA does not appear to have conducted an independent analysis of the Foreign Missions Act or of the Taiwan Relations Act. Rather, it appears to have relied

on the State Department's interpretation of those statutes. Thus, on review of the Board's order, we will evaluate its conclusions in light of the arguments advanced by the State Department.

8. The Department of State and the District of Columbia take different positions on the application of this section of the Foreign Missions Act. Resolution of this disagreement is not necessary in this case, however, and we express no views on it.

effectively controlled by—(A) a foreign government, or (B) an organization (other than an international organization, as defined in section 203(b) of this title) representing a territory or political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States or which engages in some aspect of the conduct of the international affairs of such territory or political entity....

22 U.S.C.A. § 4302(a)(4) (1987 Supp.); D.C. Code § 5–1202(a)(4) (1987 Supp.). Notwithstanding this broad language, Congress also clearly established that "[d]eterminations with respect to the meaning and applicability of the[se] terms ... shall be committed to the discretion of the Secretary [of State]." 22 U.S.C.A. § 4302(b) (1987 Supp.); D.C.Code § 5–1202(b) (1987 Supp.). As already noted, the State Department certified to the BZA that "the offices of the Defense Procurement Division of the Coordination Council for North American Affairs (CCNAA) are not recognized as a chancery or chancery annex by this Department." It added that "CCNAA premises have never been granted 'chancery status' under the Foreign Missions Act or any other provisions of U.S., District, or international law."

The parties appear to disagree over whether these determinations are subject to judicial review. Although the statute itself is silent on the matter, the Citizens Association points to an accompanying Senate Report which states that the Secretary's decisions are subject to "appropriate judicial review." S.REP. No. 329, 97th Cong., 2d Sess. 8 (1982). The State Department acknowledges this language in the report but argues that "the plain language of the statute and other pertinent legislative history ... indicate[ ] that Congress intended the Secretary's decision to be virtually unreviewable." We need not resolve this disagreement, for we conclude that, assuming this court may review the Secretary's discretionary decisions under the

Foreign Missions Act, his determinations in this case do not amount to an abuse of his discretion.

As noted in the legislative history accompanying the Foreign Missions Act, Congress was acutely aware of the potential impact on the conduct of foreign relations that its actions might have:

> The provision [committing interpretation of the terms to the discretion of the Secretary of State] is intended to avoid conflicting interpretations by different government agencies and courts and potential litigation that might detract from the efficient implementation of this title or might adversely affect the management of foreign affairs. A determination, for example, as to what constitutes diplomatic, consular, or related activity, may affect similar determinations by foreign states concerning functions of U.S. missions abroad. Such determinations might also affect implementation of multilateral treaties. Accordingly, they should not be left open to diverse interpretations under the foreign missions title.

H.R.REP. No. 102 (part 1), 97th Cong., 1st Sess. 30 (1981). With respect to Taiwan, the Secretary of State has taken no action to designate CCNAA as a foreign mission. Indeed, in response to a request from the Office of Planning, the Department of State certified that CCNAA offices "are not recognized as a chancery or chancery-annex." [9] The State Department understandably is concerned that any Department endorsement of CCNAA as a "chancery" might be conceived as an implicit recognition of a diplomatic relationship between the governments of the United States and Taiwan and might thereby cause international repercussions. Giving due deference to the Department's determination, we are not in a position to say that such concern is without foundation or an abuse of the Secretary's wide discretion in this area. It is thus readily apparent that

---

**9.** The State Department did agree that, in its view, the BZA could treat CCNAA as if it were a chancery for purposes of District of Columbia zoning regulations. *See* BZA Order at ¶ 18

("The Department of State does not consider the CCNAA to be a chancery, although, in their view, it might be treated as such under the Zoning Regulations.").

the Foreign Missions Act does not mandate treatment of CCNAA as a chancery.

That the Foreign Missions Act does not mandate such treatment, however, does not mean that the Act precludes the BZA from treating CCNAA, for zoning purposes, as if it were a chancery. The Department of State has pointed out on numerous occasions that the BZA may treat CCNAA's application under the same substantive provisions that are applicable to chancery applications. (Of course, the Department adds that CCNAA may choose such treatment or not, as it desires.) It is thus clear that the State Department does not view the Foreign Missions Act as a bar to such treatment.

Moreover, from examining the legislative intent behind the Foreign Missions Act, it appears that it was drafted without reference to the unique status of CCNAA. According to the Joint Explanatory Statement of the Committee of Conference, the broad purpose of the Foreign Missions Act was to grant the Secretary of State "authority over the activities and operations of foreign missions in the United States—authority which is long overdue." H.CONF.REP. No. 693, 97th Cong., 2d Sess. 44, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 691, 706.[10] When the definition of foreign mission was broadened in 1985, the specific purpose was to enable the Secretary of State to identify and regulate delegations from Soviet bloc nations that otherwise might not be considered foreign missions within the meaning of the statute. *See* S. REP. No. 307, 99th Cong., 2d Sess. 22–23 (1986). (The definition was broadened again in 1986.) Nowhere is there any mention of Taiwan, CCNAA, or the unique relationship between the United States and Taiwan. Put simply, it does not appear that

Congress specifically considered how the Foreign Missions Act would apply to Taiwan, given its unique status, either when Congress first passed the Act or when it later amended the statute.[11]

### B.

Our analysis does not end with the Foreign Missions Act. We must also consider what effect the Taiwan Relations Act, 22 U.S.C.A. §§ 3301 *et seq.* (1987 Supp.)., has on the Board's action. That Act was adopted in the wake of the establishment of full diplomatic relations between the United States and the People's Republic of China (PRC) on January 1, 1979. The recognition of the PRC necessitated a change in the relationship between the United States and the Republic of China (Taiwan), which previously had had full diplomatic relations with the United States. We accept the Department of State's position that the Taiwan Relations Act in no way establishes governmental relations between the United States and Taiwan. Rather, it represents an unofficial, nondiplomatic, non-governmental relationship between the people of Taiwan and the people of the United States. *See, e.g.,* 125 CONG.REC. 6708 (March 29, 1979) (remarks of Senator Frank Church) (§ 3303(a) of Taiwan Relations Act "recognizes that official, governmental relations between the United States and the governing authorities on Taiwan have been terminated"); Exec. Order 12143, 44 C.F.R. 37191 (1979), *reprinted in* 22 U.S.C.A. § 3301 note, at 124 (1987 Supp.) (describing purpose of presidential order as "to facilitate the maintenance of commercial, cultural and other relations between the people of the United States and

10. Of course, another purpose of the Foreign Missions Act was to address issues concerning the "location, replacement, or expansion of chanceries in the District of Columbia." 22 U.S.C.A. § 4306(a) (1987 Supp.); D.C.Code § 5–1206(a) (1987 Supp.). That purpose, however, sheds no light on whether Congress considered how the Act would apply to Taiwan.

11. This conclusion is bolstered by Mlotek's testimony at the January 22 hearing, where he candidly stated:

I must tell you, when we were developing the Foreign Missions Act procedures, and when I say we I mean all of us who were parties to the Foreign Missions Act legislative process, Congress, the District of Columbia, interested residents, the State Department, *people just forgot about CCNAA.* Obviously, we might not be in this [imbroglio] if we had contemplated CCNAA in 1981 and 1982—
(Emphasis added).

the people on Taiwan without official representation or diplomatic relations").

Notwithstanding this absence of governmental relations between the United States and Taiwan, we cannot ignore the plain language of the Taiwan Relations Act. The Act explicitly states:

> The absence of diplomatic relations or recognition shall not affect the application of the laws of the United States with respect to Taiwan, and the laws of the United States shall apply with respect to Taiwan in the manner that the laws of the United States applied with respect to Taiwan prior to January 1, 1979.

22 U.S.C.A. § 3303(a) (1987 Supp.). Two preliminary points need to be clarified. The State Department acknowledges, and we agree, that the term "laws of the United States" includes not only federal laws but also enactments of the Council of the District of Columbia, as well as BZA rules and regulations. The Taiwan Relations Act itself defines the term to include "any statute, rule, regulation, ordinance, order, · or judicial rule or decision of the United States or any political subdivision thereof." *Id.* § 3314(1). Similarly, there is no dispute that the term "Taiwan" includes CCNAA. *Id.* § 3314(2) ("the term 'Taiwan' includes, as the context may require, ... corporations and other entities and associations created or organized under the laws applied on" [Taiwan]).[12]

The general statement in § 3303(a) that "[t]he absence of diplomatic relations or recognition shall not affect the application of the laws of the United States" to Taiwan in the manner that they "applied with respect to Taiwan prior to January 1, 1979" is elaborated in subsequent parts of the same section. Several of these provisions are particularly relevant:

> The application of subsection (a) of this section shall include, but shall not be limited to, the following:

> (1) Whenever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms *shall* include and such laws shall apply with respect to Taiwan.

> \* \* \* \* \* \*

> (3)(A) The absence of diplomatic relations and recognition with respect to Taiwan shall not abrogate, infringe, modify, deny, or otherwise affect in any way any rights *or obligations* (including but not limited to those involving contracts, debts, or property interests of any kind) under the laws of the United States heretofore or hereafter acquired by or with respect to Taiwan.

> \* \* \* \* \* \*

22 U.S.C.A. § 3303(b) (1987 Supp.) (emphasis added).

These provisions are plain and unambiguous. Under the laws of the United States, Taiwan, and thus CCNAA, is to be treated as if derecognition had not occurred. We cannot imagine any other possible interpretation of these provisions. Contrary to the State Department's contention, these provisions do not merely allow for Taiwan to elect to be treated in the same manner that it was treated before recognition. They mandate such treatment. We cannot ignore the use of the word "shall," which creates a duty, not an option. *See, e.g., United States v. Mendelsohn,* 443 A.2d 1311, 1314–17 (D.C.1982); *Smith v. District of Columbia Rental Accommodations Comm'n,* 411 A.2d 612, 615 (D.C. 1980). Furthermore, these provisions do not contain the slightest suggestion that the decision whether continued application of the substantive provisions previously applicable to Taiwan should turn on a choice to be made by the affected entity, depending on which alternative leads to the more favorable treatment. Indeed, by the refer-

---

**12.** While conceding this point, the State Department notes that § 3314(2) qualifies the broad definition of the term "Taiwan" with the phrase "as the context may require." The Department then argues that, because of CCNAA's special status in the unique relationship between the United States and Taiwan, the context does not require that CCNAA be treated as if it were a chancery under the Taiwan Relations Act. As we explain, in the absence of contrary indications, we see no coherent reason to exclude CCNAA from this definition of the term "Taiwan."

ence to legal "obligations" as well as "rights," the provisions indicate precisely the opposite.[13] We conclude that, taken together, these provisions of the Taiwan Relations Act require that the BZA treat any application by CCNAA for an office use as though it were an application for a chancery use. Thus, while we emphasize we do not disagree with the State Department that CCNAA's premises do not in fact constitute a "chancery" (because such a designation might be seen as a form of diplomatic recognition), the "BZA"[14] must treat CCNAA's application as if it were for a chancery use, applying the same substantive consideration as it would for a chancery application under the Foreign Missions Act.

### C.

■ Recognizing the sweeping language of these provisions, the State Department contends that "in enacting the T[aiwan] R[elations] A[ct], Congress explicitly understood that the mandate of section 3303 of the TRA that U.S. law would continue to apply 'notwithstanding the withdrawal of diplomatic relations' could *not* apply to the designated entities (AIT and CCNAA), whose very existence and unique structure was predicated upon the very *lack* of such diplomatic relations." (Emphasis in original.) The first flaw with this argument is that, at the same time the State Department is claiming the mandate of § 3303 cannot apply to CCNAA, the Department also acknowledges that CCNAA may, because of the unique status of Taiwan,

choose to be treated as if it were a chancery. Presumably, in suggesting that CCNAA may choose to receive this treatment, the State Department is relying on the provisions of § 3303.[15] We reject such an anomalous interpretation of § 3303 that would apply its provisions in a piecemeal fashion at the whim of CCNAA.

The heart of the State Department's position is that, because the statute gives the President discretion in treating the designated entities (AIT and CCNAA), and because the provisions specifically dealing with AIT and CCNAA are not specifically contained within § 3303, CCNAA does not fall within the mandate of § 3303 requiring it to be treated under the same substantive standards that would apply if it were a chancery. The State Department, however, reads too much into the provisions specifically addressing CCNAA. Section 3309(a) of the Taiwan Relations Act establishes the mechanism through which CCNAA was created. It states that "any performance, communication, assurance, undertaking, or other action" rendered to or provided from Taiwan shall be accomplished through a designated instrumentality "established by Taiwan which the President determines has the necessary authority under the laws applied by the people on Taiwan to provide assurances and take other actions on behalf of Taiwan in accordance with this [Act]." 22 U.S.C.A. § 3309(a) (1987 Supp.). As already noted, the President designated CCNAA as this entity.

---

**13.** Additionally, although somewhat unclear, subsection 8 appears to indicate that, where a law otherwise would require the existence of diplomatic relations before it can be applied in a given situation, such a requirement does not apply when Taiwan is involved. Subsection 8 reads: "No requirement, whether expressed or implied, under the laws of the United States with respect to maintenance of diplomatic relations or recognition shall be applicable with respect to Taiwan." 22 U.S.C.A. § 3303(b)(8) (1987 Supp.).

**14.** Our use of the term "BZA" in this context is not meant to suggest any resolution on the merits of which type of BZA—the regularly constituted one or a special BZA—should consider the application under the substantive provisions of

the Foreign Missions Act. 22 U.S.C.A. § 4306 (1987 Supp.). Rather, all we are stating is that whatever correctly constituted Board considers CCNAA's application, it must apply the same substantive considerations as it would apply to a chancery application under the Foreign Missions Act.

**15.** Theoretically, the State Department could argue that it is not § 3303 that gives CCNAA the right to have its application treated as if it were a chancery, if it so chooses, but some other provision. As we make clear below, however, § 3309 does not provide this authority, and no other provision of the Taiwan Relations Act remotely suggests that CCNAA may choose such a course of action.

Subsection (c) of section 3309 grants the President authority "to extend with respect to the Taiwan instrumentality and its appropriate personnel, such privileges and immunities (subject to appropriate conditions and obligations) as may be necessary for the effective performance of their functions." 22 U.S.C.A. § 3309(c) (1987 Supp.). We agree with the State Department that the President could, under this provision, exempt CCNAA from the mandate of § 3303 as it applies, for example, to zoning regulations. We cannot agree, however, that by its terms, this provision automatically takes CCNAA out of the purview of § 3303; in order to accomplish this, the President must take some affirmative action.[16]

The President has taken no such affirmative action to exempt CCNAA generally from § 3303 or to exempt it specifically from being treated in the same manner as a chancery for purposes of zoning regulations in the District of Columbia. In Executive Order 12143, the President delegated to the Secretary of State his functions under § 3309(c) of the Taiwan Relations Act. Exec. Order No. 12143 at §§ 1–101 & 1–103, 44 C.F.R. 37191 (1979), *reprinted in* 22 U.S.C.A. § 3301 note at 124 (1987 Supp.). Presumably pursuant to this authority, AIT and CCNAA have entered into an Agreement on Privileges, Exemptions and Immunities Between The American Institute In Taiwan and The Coordination Council For North American Affairs. This agreement does not specify how CCNAA is to be treated for purposes of the District of Columbia zoning regulations. Rather, it grants a number of specific privileges to the employees of both AIT and CCNAA in such areas as customs and immigration. The State Department has represented, and we have no reason to doubt, that these immunities are not the same as "diplomatic immunity" which, according to the State Department, implies some sort of formal diplomatic relationship between two governments. From an examination of this agreement we can only conclude that it is not meant to affect how CCNAA is treated under the District of Columbia's zoning regulations. Accordingly, we return to the inevitable conclusion that, in the absence of a specific provision to the contrary—and we have found none—§ 3303 of the Taiwan Relations Act mandates that any zoning application by CCNAA must be treated under the same substantive provisions of the Foreign Missions Act, coupled with the applicable zoning regulations, as would an application for a chancery use.

### III.

The Citizens Association and the State Department have expressed different views on precisely how the provisions applicable to chanceries should apply. Because the BZA treated CCNAA's application as it would an application for general office use, the BZA has not yet issued any ruling on how it would apply the substantive considerations of the Foreign Missions Act to CCNAA's application. We thus have no ruling to review in this context. Under the circumstances, any decision bearing on the merits of how the Board should handle such an application "would serve merely as an advisory opinion." *Ford v. Turner*, 531 A.2d 233, —— (D.C.1987) (quoting *Banks v. Ferrell*, 411 A.2d 54, 57 (D.C.1979)). We decline the opportunity to give one.

*Reversed and remanded.*

---

**16.** The State Department also points to a comment by Representative Zablocki in the debate on the Taiwan Relations Act to support its argument. In response to a concern that the Presidential waiver provision of § 3309(c) might apply generally and thereby undermine the mandate of § 3303, Representative Zablocki responded that "the waiver of authority is only given to the President to the extent that it deals with the [unofficial] entity [CCNAA]." 125 CONG. REC. 4752–53 (March 13, 1979). This comment is consistent with our interpretation of § 3309(c). It indicates that, with respect to CCNAA only, the President may, if he or she so chooses, waive the mandatory application of § 3303. We do not read it as in any way suggesting that, in the absence of any action by the President, the provisions of § 3303 do not apply to CCNAA.