**EMBASSY OF THE PEOPLE'S REPUBLIC OF BENIN,** Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,** Respondent,

and

Woodley Park Community Association, Intervenor.

No. 85–1142.

District of Columbia Court of Appeals.

Argued Sept. 28, 1987.

Decided Nov. 30, 1987.

Marc Palay, with whom Mark A. Clodfelter, Washington, D.C., was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Joanne W. Young, with whom H. Lalla Shishkevish, Washington, D.C., was on the brief, for intervenor Woodley Park Community Ass'n.

John P. Schnitker, U.S. Dept. of Justice, with whom Abraham D. Sofaer, U.S. Dept. of State Legal Advisor, Bruce Rashkow, Morton J. Holbrook, III, and Ronald S. Mlotek, U.S. Dept. of State, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Michael J. Singer, U.S. Dept. of Justice, Washington, D.C., were on the brief, for amicus curiae U.S.

Before NEWMAN [*], TERRY, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

The Embassy of Benin (Benin) appeals from the denial by the Board of Zoning Adjustment (BZA) of the Embassy's application to construct a thirty-eight foot antenna tower at the site of its chancery for the purpose of operating a diplomatic radio station. Benin argues that although its application for a special exception, *see* 11 D.C.M.R. § 8207.2 (1982), was made under § 3108 of the zoning regulations, 11 D.C.M. R. § 3108 (1982),[1] the zoning regulations, as applied, unconstitutionally trespass upon the field of foreign affairs which is reserved exclusively to the federal government, deny Benin rights under both the 1961 Vienna Convention on Diplomatic Relations and an agreement between the governments of Benin and the United States, and operate in an area preempted by § 305(d) of the Federal Communications Act. Benin also argues that, accepting the applicability of the zoning regulations, the BZA made findings of fact which are without the support of substantial evidence in the record and failed to relate rationally those findings to the relevant standards of the zoning regulations.

We hold that Benin's application for a special exception to construct a radio antenna tower is subject to the procedures established by the Foreign Missions Act (FMA), 22 U.S.C.A. § 4301 *et seq.* (1987 Supp.); D.C.Code § 5–1201, *et seq.* (1987 Supp.),[2] and that the BZA was not free to treat the application as it would the application of any other property owner. Accordingly, because the BZA had no jurisdiction under the local zoning procedures, we reverse its decision.

**I**

The Benin chancery was established on Cathedral Avenue in 1967. On November 8, 1979, the Embassy of Benin requested the State Department's permission to install a radio station transmitter-receiver for direct communication with Cotonou, the capital city of Benin. On May 21, 1980, the State Department granted Benin permission to "install and operate a low-power radio station in the fixed service at or near the site of its Embassy in Washington for the transmission of its official messages to points outside the United States." The State Department further stated that it would "consider the present note and the Embassy's reply concurring therein as constituting an agreement in principle between the two governments, which will enter into force on the date of the reply note." This statement advised Benin that a construc-

---

[*] This case was originally argued on August 14, 1986, before a division of the court consisting of Judges Nebeker, Terry and Rogers. Judge Newman was chosen as a member of the panel after Judge Nebeker withdrew from the case as a result of his anticipated retirement as an active judge.

[1] Since the date of BZA's decision, the zoning regulations have been renumbered. For the sake of clarity, however, we will refer to the same codification of the regulations as did the

BZA. The zoning regulations will therefore refer to Title 11 of the 1982 codification of the D.C. Municipal Regulations unless otherwise specified.

[2] The FMA appears in §§ 202 and 203 of the Department of State, International Communication Agency, and Board for International Broadcasting appropriations authorizations. Pub.L. No. 97–241, 96 Stat. 273, 282, 290 (1982).

tion permit would not be required for a roof-mounted antenna if the mast did not exceed twenty feet in height but that a permit would be required for a ground-mounted antenna. It further advised that the permit could be granted by the D.C. Zoning Administrator if the ground-mounted antenna did not exceed forty feet; otherwise, if the structure exceeded that height, Benin would have to seek a special exception from the BZA. Authorization to transmit from the radio station would be granted after the federal government had approved the technical specifications submitted by Benin.

Following submission by Benin of the technical specifications for its radio installation, the State Department forwarded its recommendation for approval to the National Telecommunications Information Agency of the Department of Commerce (NTIA). On June 12, 1984, the State Department informed Benin that the processing of the technical specifications had been completed and that the operation of a low-power radio station in the fixed service at or near the site of the Embassy in Washington had been authorized. Benin then forwarded its application for construction permits to the State Department for submission to the Zoning Administrator. The application to the BZA stated the basis for the construction of the antenna as follows:

The erection of the antenna is required in conjunction with the installation of radio equipment for diplomatic use, which has been approved by the State Department, pursuant to Section 205 of the Foreign Missions Act.

The Zoning Administrator denied Benin's initial request to build a new generator room on the chancery property on the grounds that "the chancery is located in a 'R–3' District [3] and under § 3101.313 of the zoning regulations, the chancery is not allowed to expand...." Upon revision of its plans, Benin received approval from the Zoning Administrator to renovate its existing garage to serve as a generator. The State Department then advised Benin that the permit to convert the garage did not include permission to construct a radio antenna, which would require a separate building permit. Thereafter the Zoning Administrator advised Benin that he could not grant the application to construct a thirty-eight foot antenna tower because it was not permitted as a matter of right in an R–3 District, but Benin could apply to the BZA for a special exception under § 3101.47 [4] of the zoning regulations. On December 7, 1984, Benin filed an application for a special exception with the BZA. The State Department intervened in support of Benin, and both the Woodley Park Community Association (intervenor) and

---

3. R–3 refers to row house, single family dwellings. 11 D.C.M.R. § 320.1 (1987).

4. Section 3101.4 of the zoning regulations provides that certain enumerated uses are permitted if approved by the BZA subject to the conditions specified in § 8207, which authorizes the BZA to grant special exceptions if the exception is in harmony with the general zoning plan and will not adversely affect the use of neighboring property. See 11 D.C.M.R. § 8207.2 (1982). Antenna towers are among those uses made subject to BZA approval under § 3101.47, which provides:

Antenna tower for television and frequency modulation broadcasting to any height and in conjunction therewith the erection, alteration, or use of *buildings* for transmission or reception equipment on the same *lot* or elsewhere, provided that:
3101.47 The proposed location and height will not affect adversely the use of neighboring property in accordance with these regulations;

3101.472 Any part of an atenna [sic] tower is removed from all *lot lines* a distance of at least one-sixth of its height or is separated from other property by an intervening *street;*
3101.473 The proposed height of the tower is reasonably necessary to render satisfactory service to all parts of its service area;
3101.474 Any transmission equipment located in a Residence District must be located in such *district* for technically satisfactory and reasonably economical transmission;
3101.475 Before taking final action on an application for such use, the Board shall have submitted the application to the District of Columbia Municipal Planning Office for review and report; and,
3101.476 Any height of such tower in excess of that permitted by the Act of June 1, 1910 (36 Stat. 452), as amended, must be approved by the Commissioners of the District of Columbia.
11 D.C.M.R. § 3101.47 (1982) (emphasis in original).

Advisory Neighborhood Commission 3C opposed the petition.

After hearings, the BZA denied Benin's application for a special exception. The BZA concluded that the application did not come within the FMA, 22 U.S.C.A. § 4301 *et seq.* (1987 Supp.); D.C.Code § 5–1201 *et seq.* (1987 Supp.), requiring consideration of the criteria under Article 46 of the zoning regulations,[5] that the issues of expansion of a chancery and the FMA were not properly before it, and that it had heard the application solely upon the special exception criteria of §§ 3101.47 and 8207.2 of the zoning regulations. Thus, the BZA heard Benin's application for a special exception in the same manner as it would that of any other property owner in an R–3 District. The BZA also concluded that Benin did not seek to exercise any rights under 11 D.C. M.R. § 3101.313 (1982),[6] and that "federal law did not preempt local regulation of foreign government radio stations in the District of Columbia" or regulation of the height and location of those radio antennas.[7] Accordingly, the issue before the BZA was whether the proposal by Benin met "the requirements of Paragraph 3101.-47 of the Zoning Regulations ... the relief requested can be granted in harmony with the general purpose and intent of the Zoning Regulations, and the relief will not tend adversely to affect the use of neighboring property."

The BZA found that Benin had not met its burden of proof to show that the proposed antenna tower would not affect adversely the use of neighboring property. It concluded that the proposed tower would visually intrude on the residential character of the neighborhood; have an adverse effect on the value of neighboring property due to its proximity to residences directly west of the chancery and its thirty-eight foot height; and constitute an attractive nuisance to the children of the neighborhood. The BZA further noted that it had "accorded to the ANC the 'great weight' to which it is entitled under [D.C.Code § 1–261(d) (1981)]."[8]

Benin noted an appeal to this court on December 26, 1985. On July 25, 1986, the State Department, which did not file an appeal from the BZA order denying Benin's application, filed an application with the BZA for review of the Zoning Administrator's decision and the BZA's decision under the standards set forth in the FMA; the BZA returned the papers as insufficient to meet the basic requirements for an application or appeal to the BZA. This court heard argument on August 14, 1986, at which time it ordered that the United States be permitted to file a brief as *amicus curiae* and that each party be permitted to reply.[9]

## II

The threshold issue presented in this appeal from the order by the BZA denying Benin a special exception is one of jurisdic-

---

5. Article 46 of the zoning regulations, 11 D.C.M. R. §§ 4601–4608 (1982), established regulations for the location of chanceries and international agencies and provided a review process designed "to give special care to the protection of residential areas...." 11 D.C.M.R. § 4601 (1982) (preamble).

6. Section 3101.313 of the zoning regulations permitted as of right chancery uses antedating September 22, 1978, but made any additions to buildings or structures subject to BZA approval.

7. The BZA acknowledged that federal law did preempt local regulation of the transmission and frequency assignment of the antennas, and declined to consider the issue of radio interference in view of the concurrent authority of the FCC, NTIA and the Department of State to regulate the nature and extent of permissible interference by a radio transmitter. It based its conclusion that the Federal Communications

Act of 1934, as amended, did not preempt local regulation of foreign government radio stations in the District of Columbia on the grounds that the Communications Act does not grant an absolute right as to the location of the antenna and the State Department took the position that any preemption of BZA authority was limited to regulation of the assignment and interference of radio transmissions.

8. *See Kopff v. District of Columbia Alcoholic Beverage Control Board,* 381 A.2d 1372, 1384 (D.C.1977).

9. Subsequently this court granted several continuances of the briefing schedule at the request of the parties, and consequently further oral argument, requested by the parties, did not occur for more than one year.

tion.[10] Simply put, the question is whether the BZA established by D.C.Code § 5–424 (1981) was the proper body to consider Benin's application. The BZA concluded as a matter of law that the FMA was inapplicable and that Benin's application therefore did not have to be determined on the basis of the criteria set forth in Article 46 of the zoning regulations. Accordingly, we must first decide whether the FMA applies to Benin's application, and if so, whether the BZA could nevertheless treat Benin's application solely under local zoning laws that would apply to any property owner. *Gordon v. District Unemployment Compensation Board*, 402 A.2d 1251, 1254 (D.C. 1979) (where agency action is based on a determination of law which is subject to judicial review, agency action may not stand if agency misconceives the law) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)); *see Saah v. District of Columbia Board of Zoning Adjustment*, 433 A.2d 1114, 1116 (D.C.1981) (and authorities cited).

We first review the language of the FMA and its legislative history to determine the aims of Congress in enacting the FMA. *Davis v. Gulf Oil Corp.*, 485 A.2d 160, 166 (D.C.1984); *see generally Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) (en banc) (court may properly resort to explanatory legislative history no matter how clear statute may appear upon superficial examination) (quoting *Harrison v. Northern Trust Co.*, 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1946)). We then examine whether the FMA is the exclusive procedure available to Benin. Finally, we consider whether this court or the special BZA created by the FMA should initially decide whether Benin's application for a special exception involves an expansion under § 206(a) of the FMA.

### A.

The Foreign Missions Act was enacted in 1982 "to address a serious and growing

imbalance between the treatment accorded in many countries to official missions of the United States, and that made available to foreign government missions in the United States." S.REP. No. 329, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS pp. 651, 714; *see also* 22 U.S.C.A. § 4301; D.C.Code § 5–1201. The Act was designed to provide the Secretary of State with the leverage necessary to remove unreasonable restraints and costs on United States missions abroad, and to enhance national security both domestically and overseas. Sponsors of the legislation maintained that without the ability to control services provided to foreign missions within this country, the United States government would neither be able to carry out its international treaty obligations to facilitate the operation of foreign missions in the United States, nor be in a position to insist on reciprocal treatment abroad. *See generally* 127 CONG.REC. 6102–03 (1981) (statement of Sen. Percy).

Congress recognized that the District of Columbia, as the seat of the national government and the site of the greatest number of official foreign missions in the United States, had unique obligations involving the federal government and would therefore have to be treated differently for the purposes of regulating foreign missions. 128 CONG.REC. 7797, 7800 (1982); *see also* S.REP. No. 329, 97th Cong., 2d Sess. 3–4, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 714, 716–17. For this reason, the provisions of the FMA relating to foreign missions in the District of Columbia are set apart from other provisions which are of general applicability elsewhere in the United States. *See* H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 40, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 691, 702.

Review of the legislative history of the FMA reveals that Congress meant to rectify certain problems inherent in the then-existing procedures for resolving issues relat-

---

**10.** This court has jurisdiction to review a final order of the BZA. D.C.Code § 1–1510(a)(3)(A), (C)–(E) (1981).

ing to chanceries in the District of Columbia. First, proponents of the FMA contended that the District's zoning and planning authorities failed to give sufficient weight to the national government's interest in foreign affairs in making decisions regarding the benefits [11] to be accorded foreign missions in the District. S. REP. No. 329, 97th Cong., 2d Sess. 3, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 714, 716. Congress intended to assure that in deciding issues relating to the location and operation of foreign missions, the local and federal interests would be appropriately balanced. Congress recognized that the decision of chancery issues could have a substantial impact on United States interests abroad and was determined that the nation's international legal obligations should not be subject to negation by the acts or omissions of local officials. S. REP. No. 283, 97th Cong., 1st Sess. 11–12 (1981); H.R. REP. No. 102, 97th Cong., 1st Sess., pt. 1, at 34 (1981).

Second, Congress also perceived that the protection of United States interests abroad required the expeditious resolution of chancery issues and consequently sought to eliminate the time-consuming and overlapping proceedings which resulted under the then-existing practices. *See* 127 CONG.REC. 20,879 (1981) (statement of Rep. Fascell). Those practices "virtually insure[d] that the Federal interest in providing adequate facilities for foreign missions will be frustrated." H.R. REP.No. 102, 97th Cong., 1st Sess., pt. 1, at 36 (1981). Thus, the FMA requires that chancery issues be decided within six months from the date of the filing of an application by a foreign government. 22 U.S.C.A. § 4306(c)(3) (1987 Supp.); D.C.Code § 5–1206(c)(3) (1987 Supp.). In addition, the conference committee report expressed the hope that decisions will be made within an even shorter period. H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 41, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 691, 703.

The extent to which the FMA provisions regulating chanceries would replace District of Columbia zoning law was the source of disagreement among the members of Congress. Section 206 of the original House bill sought to establish a District of Columbia Foreign Missions Commission with exclusive jurisdiction over chancery issues. *See* 127 CONG.REC. 20,877–78 (1981) (text of proposed bill). The corresponding section in the initial Senate version of the bill, S. 854, would have made "the location, height, bulk, number of stories, and size of any building or other real property of a foreign mission in the District of Columbia" subject to the approval of the National Capital Planning Commission. 127 CONG. REC. 6104 (1981) (text of § 206(a) of S. 854). This prompted objections from senators who argued that total preemption of local authority regarding chanceries was both unnecessary and a violation of the principle of home rule for the District of Columbia. *See generally* S.REP. No. 329, 97th Cong., 2d Sess. 40–48, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 714, 739–47 (minority views of Senators Mathias, Eagleton, Rudman, Levin, and Sasser in opposition to S. 854). The senators' principal arguments were that the federal interest was already adequately represented on the D.C. Zoning Commission as then constituted, 128 CONG.REC. 7795 (1982) (statement of Sen. Rudman), and that they found no evidence to support the State Department's claim that the District government authorities had failed to give sufficient attention and weight to federal interests in ruling on

---

**11.** With respect to a foreign mission, the FMA defines "benefits" as

any acquisition, or authorization for an acquisition, in the United States by or for a foreign mission, including the acquisition of: (A) Real property by purchase, lease, exchange, construction, or otherwise; (B) public services, including services relating to customs, importation, and utilities, and the processing of applications or requests relating to public services; (C) supplies, maintenance, and trans-

portation; (D) locally engaged staff on a temporary or regular basis; (E) travel and related services; and (F) protective services; and includes such other benefits as the Secretary may designate.

22 U.S.C.A. § 4302(a)(1); D.C.Code § 5–1202(a)(1). The legislative history indicates that this list was intended to be illustrative and not exhaustive. S. REP. No. 283, 97th Cong., 1st Sess. 6 (1981).

chancery applications. 128 CONG.REC. 7805 (1982) (statement of Sen. Mathias); *id.* at 6921, 7808 (statement of Sen. Eagleton). Senator Mathias succeeded in gaining Senate approval of an amendment to delete § 206 from the bill. 128 CONG.REC. 7812 (1982) (Amendment No. 1383 to S. 854); *see* 128 CONG.REC. 7795 (1982) (text of amendment).

The conference committee adopted more limited language than that first proposed in either the House or the Senate, H.R. CONF. REP. NO. 693, 97th Cong., 2d Sess. 40, *reprinted in* 1982 U.S. CODE CONG. & ADMIN. NEWS 691, 702, and reinstated a section governing foreign missions in the District of Columbia. *Id.* at 39, 1982 U.S. CODE CONG. & ADMIN.NEWS at 701. The committee's recommendations were ultimately adopted and enacted into law. *See* 22 U.S.C.A. § 4306 (1987 Supp.); D.C.Code § 5–1206 (1987 Supp.). The final compromise left D.C. zoning law intact to the extent it was consistent with the FMA. H.R. CONF.REP. NO. 693, 97th Cong., 2d Sess. 43, *reprinted in* 1982 U.S.CODE CONG. & ADMIN. NEWS 691, 705; *see* 22 U.S.C.A. § 4306(j) (1987 Supp.); D.C.Code § 5–1206(j) (1987 Supp.).

The language of the FMA leaves little doubt that Congress wished to create a comprehensive scheme for the fair and expeditious decision of issues relating to foreign chanceries in the District of Columbia. The Act is broad in scope and reflects the Congressional intent to insure that the federal interest in foreign affairs is adequately weighed in the decision of chancery issues. The Act's statement of Congressional findings and policy, 22 U.S.C.A. § 4301(a); D.C.Code § 5–1201(a), makes the "operation in the United States of foreign missions ..., *including the permissible scope of their activities and the location and size of their facilities* " [emphasis added] subject to the exercise of federal jurisdiction. Thus, the FMA creates an Office of Foreign Missions within the Department of State to provide guidance on reciprocity and national security issues, and to assist federal, state, and municipal governments in making determinations as to the propriety of a grant or denial of benefits to foreign missions. 22 U.S.C.A. § 4303; D.C.Code § 5–1203.

With regard to the problems of foreign missions in the District, the FMA creates special mechanisms "to assure that the substantial Federal interest in the location of foreign missions is weighed equally with municipal concerns." S. REP. NO. 329, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S. CODE CONG. & ADMIN. NEWS 714, 715. Section 206 of the FMA, 22 U.S.C.A. § 4306; D.C.Code § 5–1206, applies to the location, replacement and expansion of chanceries in the District of Columbia. It specifies where chanceries will be permitted to locate and provides that

any determination concerning the location of a chancery ... *or concerning an appeal of an administrative decision with respect to a chancery based in whole or in part upon any zoning regulation or map,* shall be based solely on the following criteria:

(1) The international obligation of the United States to facilitate the provision of adequate and secure facilities for foreign missions in the Nation's Capital.

(2) Historic preservation, as determined by the Board of Zoning Adjustment in carrying out this section, and in order to ensure compatibility with historic landmarks and districts, substantial compliance with District of Columbia and Federal regulations governing historic preservation shall be required with respect to new construction and to demolition of or alteration to historic landmarks.

(3) The adequacy of off-street or other parking and the extent to which the area will be served by public transportation to reduce parking requirements, subject to such special security requirements as may be determined by the Secretary, after consultation with federal agencies authorized to perform protective services.

(4) The extent to which the area is capable of being adequately protected, as determined by the Secretary, after consultation with federal agencies authorized to perform protective services.

(5) The municipal interest, as determined by the Mayor of the District of Columbia.

(6) The Federal interest, as determined by the Secretary of State.

22 U.S.C.A. § 4306(d); D.C.Code § 5–1206(d) (emphasis added).

This is consistent with the emphasis in both the House and Senate Reports on the need for federal participation in decisions concerning foreign missions in the United States:

> Chanceries are the primary representational and functional offices of sovereign states accredited to the United States, which are required to be located in the capital city. Chanceries are inviolable, perform government functions requiring special communications and security, and are entitled to special protection by virtue of treaty obligations.
>
> The United States Government has an international obligation to facilitate the acquisition of acceptable and secure chancery locations in the capital city, which is directly related to reciprocal treatment of United States missions abroad, as well as to national security concerns here.
>
> Furthermore, national security issues are often involved both in the United States and overseas, so a procedure wherein the Federal interest is properly balanced with community impact is an important element of this title.

S. REP.No. 329, 97th Cong., 1st Sess. 12, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 714, 725.

> If important Federal concerns are not a significant part of the process in which the foreign government chanceries are located within the capital, the United States will find it difficult to insist on reciprocal treatment abroad. The City of Washington, remains the Federal capital of our government, and there are obligations local officials must assume as a result which involve accommodating various Federal responsibilities in the Capi-

tal. Anything less will undermine the Congressional purpose of this legislation. *Id.* at 16, 1982 U.S. CODE CONG. & ADMIN. NEWS at 729; *see also* H.R. REP. NO. 102, 97th Cong., 1st Sess., pt. 1, at 34 (1981).

### B.

 This court has only once had occasion to construe the FMA.[12] In *Dupont Circle Citizens Association v. District of Columbia Board of Zoning Adjustment,* 530 A.2d 1163 (D.C.1987), the court recently considered whether the BZA was required to treat an application for a variance and special exception made by the Coordnation Council for North American Affairs (CCNAA), a not-for-profit corporation established by the Taiwan Relations Act, as an application for chancery use. The court held that, although CCNAA's property was not a chancery because the United States maintains no formal diplomatic relations with Taiwan, the application must be treated as one for chancery use. It therefore followed that because CCNAA's application would have to be considered as one for chancery use, it would have to be reviewed by a BZA applying only the substantive provisions of the FMA, rather than the generally applicable zoning regulations. *Id.* at 1165 n. 4. The court concluded that the FMA applied not only because it defines the term "chancery", *see* note 13 *infra,* "but also because it establishes the procedures through which zoning decisions concerning chanceries are to be made." *Id.* at 1167. The court also stated that the provisions of the FMA "preempt[ed] any otherwise applicable zoning regulations," *id.,* but declined to express any opinion on the particular application of § 206. *See id.* at 1167 n. 8. Nor did it resolve which type of BZA—the regularly constituted one under D.C.Code § 5–424 or the special BZA created by the FMA (FMA–BZA), 22 U.S.C.A. § 4306(i); D.C.Code § 5–1206(i)—should consider a chancery's application for a special exception. *Id.* at 1171 n. 14. This court, therefore, has not directly confront-

---

**12.** Our research reveals that no other court has decided the questions under the FMA now presented to this court. *Cf. City of Englewood v. Socialist People's Libyan Arab Jamahiriya,* 773

F.2d 31, 33 (3d Cir.1985) (referring to FMA requirement that foreign mission notify Secretary of State of intent to acquire real property).

ed the issues presented in the instant case. For reasons we set forth below we agree with the conclusions reached in *Dupont Circle, supra,* and hold that the FMA applies to Benin's application and that it is the exclusive procedure available to Benin to obtain a special exception for construction of a radio tower and antenna.

The language and legislative history of the FMA compel us to hold that Benin's application was required to be treated as a FMA case. Benin's application presents precisely the type of situation envisaged by Congress when it passed the FMA and falls squarely within the purview of the statute.[13] Section 206 of the Act, 22 U.S.C.A. § 4306; D.C.Code § 5–1206, although entitled "Location in the District," was intended to regulate more than the mere location of chanceries. Evidence that Congress intended the FMA to govern situations such as the instant case is provided by use of the term "expansion" in subsection (a) and by the statement of Congressional findings and policy in the FMA itself. Section 201(a) makes abundantly clear that the FMA was designed to address the type of issue presented by Benin's request to build a radio tower and antenna at the site of its chancery. That section states that the "permissible scope of [foreign missions'] activities and the location and size of their facilities" are properly subject to federal jurisdiction. 22 U.S.C.A. §§ 4301(a); D.C. Code § 5–1201(a). In addition, the conference committee report on § 206 remarks that the criteria of subsection (d) are to be applied "in the determination of chancery issues." H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 41, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 691, 703. The language of the conference report is general and indicates that the FMA was enacted to govern the decision of a wide range of issues relating to chanceries in the District.

Our conclusion is supported by the statutory language and legislative history as well as by the nature of the activity herein involved. Congress in enacting the FMA and the State Department in applying it have recognized the particularly important nature of communications issues. Although the federal government's concerns with respect to the location of chanceries in the District are not identical to the specific concerns raised by Benin's request to construct a radio tower and antenna, the federal interest in communications issues remains great. In its discussion of § 206, Congress indicated its awareness that arrangements made to accommodate the special communications needs of foreign missions would have a direct impact on the United States' interests abroad. *See* S.REP. No. 329, 97th Cong., 1st Sess. 4, *reprinted in* 1982 U.S.CODE CONG. & ADMIN. NEWS 714, 717.[14] The conferees reported that by directing the Secretary of State to require "substantial compliance" with local laws, § 206(g) not only imposed a requirement "stricter than current practice under which [building and related] codes are not enforced with respect to foreign missions because of diplomatic immunity," but it also "permit[ted] the Secretary of State to accommodate special building requirements, generally involving security, *communications*, and related needs, which are often required to be adjusted in a similar manner for U.S. missions abroad." H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 42, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 691, 704 (emphasis added). Voicing a similar point, Ronald Mlotek, Legal Counsel to the Office of Foreign Missions at the Depart-

---

**13.** There is no dispute that this case concerns an application by a chancery as that term is defined in 22 U.S.C.A. § 4302(a)(2) and D.C.Code § 5–1202(a)(2):

"Chancery" means the principal offices of a foreign mission used for diplomatic or related purposes, and annexes to such offices (including ancillary offices and support facilities), and includes the site and any building on such site which is used for such purposes.

**14.** The Senate report stated:

Chancery facilities of foreign governments accredited to the United States are special facilities, with security, *communications* and representation requirements that are very different than other types of institutional or office uses. *Arrangements made for these governments in Washington directly affect U.S. interests abroad.*

S. REP. No. 329, 97th Cong., 1st Sess. 4, *reprinted in* 1982 U.S.CODE CONG & ADMIN.NEWS 714, 717 (emphasis added).

ment of State, testified before the BZA in the instant case that:

> The State Department has to consider that some aspects of Embassy conduct are so sensitive and so important that they require treatment by the Department of State which is different from the attitude that the Department of State, through the Office of Foreign Missions, would take with respect to some other aspect of land use planning or zoning conduct that a Foreign Mission might engage in, such as adding an addition to the house or another story, or building a swimming pool or installing a tennis court in a residential neighborhood.

> Two aspects of Embassy conduct ... have to be treated with this exceptional viewpoint. One is, of course, the physical security of the Embassy and the personal security of the people who work there....

> Secondly, *communications have to be viewed with an exceptional attitude because the whole conduct of United States foreign affairs abroad relies, to an incredible extent, upon rapid and absolutely reliable communications.* [Emphasis added].

In sum, Congress recognized that chancery location and communications facilities involve similar, exceptional federal interests. Moreover, the Senate floor debate remarked upon the "special federal involvement and interest" in the safe location of foreign missions in the District, 128 CONG. REC. 7797, 7800 (1982), and upon the inevitable tension between this interest and local concerns. Both the Senate and House noted, for example, that areas of high density commercial and apartment zones would often be deemed unacceptable for security reasons, S. REP. No. 329, 97th Cong., 2d Sess. 4, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 714, 717; H.R. REP. No. 102, 97th Cong., 1st Sess., pt. 1, at 35 (1981), but that residential areas would often be deemed unacceptable by local bodies due to the intrusion into the character of the neighborhood. *Id.* Because this tension is present in chancery radio tower and antenna cases such as Benin's, the federal interest is substantial, and Con-

gress deliberately established a procedure specifically designed to accommodate the competing local and federal concerns in the District of Columbia, we conclude that the FMA provides the exclusive procedure available for consideration of Benin's application, and that the BZA established by D.C.Code § 5–424 was without jurisdiction to review the application solely under District of Columbia law.

■ It necessarily follows that we also find unpersuasive the contention of amicus United States that Congress, in enacting the FMA, intended to create two independent and parallel schemes, one federal and one local, for resolution of chancery issues. The statutory language and the legislative history of the FMA make clear that the two schemes interpretation advocated by amicus is precisely the type of duplicative procedure that the statute was designed to prevent. The language of the statute with respect to the types of issues which fall within the purview of the FMA is broad in scope. Section 201(a) states that the operation of foreign missions in the United States, including the permissible scope of their activities, is a proper subject for the exercise of federal jurisdiction. 22 U.S.C.A. § 4301(a): D.C.Code § 5–1201(a). Section 206 is phrased in mandatory language, providing that issues regarding "[t]he location, replacement, or expansion of chanceries in the District of Columbia shall be subject to this section," 22 U.S.C.A. § 4306(a); D.C.Code § 5–1206(a) (emphasis added), and, specifically, that any determination concerning an appeal of an administrative decision with respect to a chancery based in whole or in part upon any zoning regulation or map shall be based solely on the enumerated criteria. 22 U.S.C.A. § 4306(d); D.C.Code § 5–1206(d). The preemption language of § 207 further indicates the exclusivity of § 206. *See* 22 U.S.C.A. § 4307; D.C.Code § 5–1207.

Further evidence of the Congress' intent that the provisions of the FMA should exclusively govern the location and expansion of chanceries in the District may be drawn from the "Technical and Conforming Amendments" of the FMA. Those amend-

ments repealed the provisions of D.C. Code § 5–418(b) through (e) (1981), which had imposed limitations on the construction, alteration, or conversion of buildings for chancery use. *See* FMA, *supra* note 2, § 203(c), 96 Stat. at 291. The FMA thus fully supplanted the previously-existing District of Columbia law regarding location and expansion of foreign missions.

The legislative history also demonstrates the flaws in amicus' argument. During the House debate on the FMA, Congressman Fascell, floor manager of the legislation, stated with reference to the House proposal of an exclusive procedure before the National Capital Planning Commission (NCPC),[15] "Section 206(i) is intended to assure the establishment of an expeditious decision making process, *which will preclude overlapping and time-consuming proceedings which can result under existing law and regulations.*" 127 CONG.REC. 20,879 (1981) (emphasis added). The amended version of § 206 subsequently enacted by Congress evinces Congress' intent that chancery issues be resolved expeditiously. Section 206(c)(3) requires that a final determination concerning the location, replacement, or expansion of a chancery shall be made not later than six months after the date of the filing of an application. 22 U.S.C.A. § 4306(c)(3); D.C.Code § 5–1206(c)(3). Section 206(f) reinforces the expeditious nature of the proceedings by providing that they shall constitute rule-making and not be adjudicatory. 22 U.S.C.A. § 4306(f); D.C.Code § 5–1206(f). The inevitable result of the intepretation urged by amicus would hardly be conducive to the speedy and efficient resolution of chancery issues but would create just the sort of overlapping, drawnout proceedings that Congress sought to eliminate.

Amicus' reliance on a statement in the conference report, that the conferees had deleted a provision in the House bill establishing the FMA as the exclusive law governing foreign missions in the District of Columbia, is misplaced. Viewed in context the statement does not support an interpretation consistent with two parallel schemes where location, replacement or expansion of a chancery is involved. The conferees explained in their analysis of the changes made in the conference bill that they had deleted the House "provision establishing the FMA as the exclusive law governing foreign missions in the District of Columbia" by providing in § 206(j) that "other provisions of law shall apply to chanceries in the District of Columbia only to the extent they are consistent with this section." H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 43, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 691, 705. This explanation is fully consistent with the specific retention in the conference bill of the existing District of Columbia zoning structure, leaving intact the local majorities on the Zoning Commission and the BZA, while mandating the application of special criteria "which take into consideration international obligations and the need to balance municipal and federal interests." *Id.* at 40, 1982 U.S. CODE CONG. & ADMIN.NEWS at 702. It is further fully consistent with the limitation on the scope of § 206 expressed in subsection (a). But the conferees' statement is not consistent with an interpretation that a chancery could seek benefits under local law when the FMA applied.[16] The conference committee report states, moreover, that the intended effect of § 207 ("Preemption") was to insure that foreign missions would be precluded from relying on local law in an effort to secure benefits contrary to limitations imposed by the Secretary of State, *see* H.R. CONF.REP. No. 693, 97th Cong., 2d Sess. 43, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 691, 705; it provides exceptions only for §§ 202 through 205, and not for § 206. Given Congressional concern that the federal in-

---

**15.** 40 U.S.C. § 71a (1982); D.C.Code § 1–2001 *et seq.* (1981).

**16.** In so holding we do not diminish the importance of the concerns expressed by intervenor. Notwithstanding amicus' position that a local alternative to the FMA is available to Benin, intervenor's like position, joined by the District of Columbia, is simply contrary to the explanation by the Senate–House conferees of their amendments to the bill and the adoption by Congress of the conferees' bill.

terest in the field of international relations was receiving insufficient attention from local authorities in conferring benefits upon foreign missions, the Secretary's authority with respect to benefits cannot reasonably be read as permitting the Secretary to ignore the special procedures of § 206 for the District of Columbia.

Reliance on the language of subsection (d) of § 206 offers no more persuasive support of amicus' interpretation of the FMA. Although the subtle distinctions between original and appellate jurisdiction in BZA proceedings may be well established in the law,[17] there is absolutely no indication in any of the many Congressional reports that Congress intended the FMA to be inapplicable where a chancery sought a special exception following advice by the Zoning Administrator that the activity was otherwise prohibited by the zoning regulations. In any event, amicus conceded at oral argument that Benin, having filed its application for a special exception with the D.C. Zoning Administrator, was appealing from his decision when it sought reversal by the BZA. Consequently, application of the FMA as the exclusive procedure available to Benin is required. 22 U.S.C.A. § 4306(d); D.C.Code § 5–1206(d).

That Congress would want § 206 to be the exclusive procedure available to chanceries in the District of Columbia can readily be appreciated in view of the fact that the FMA arose out of the ashes of the D.C. Location of Chanceries Act of 1979, D.C. Act 3–120 (1979). In that legislation the District of Columbia government attempted to prohibit further location of chanceries in

lower density residential areas.[18] The Ninety-Sixth Congress, with strong State Department support, exercised for the first time Congress' power of disapproval of acts of the D.C. Council pursuant to the D.C. Self–Government and Governmental Reorganization Act, D.C.Code § 1–207 (1981). See H.R. Con. Res. 228, 96th Cong., 1st Sess., reprinted in Location of Chanceries: Hearings on H.R. Con. Res. 228 and H.R. 6138 Before the Subcomm. on Metropolitan Affairs of the House Comm. on the District of Columbia 92 (Dec. 19, 1979).

The FMA was a compromise between diametrically opposed points of view in the House and Senate on what law should govern and what entity should make decisions about chanceries in the District of Columbia. While the interests of the District of Columbia were successfully reasserted in the conference committee to defeat the NCPC mechanism of the House bill, they were not restored to the full extent of the Senate bill. Viewed in this context, adoption by this court of amicus' position, that Benin is entitled to seek a special exception to construct the radio tower under local zoning procedures while reserving its right—in the event its request was denied under local law—to pursue its request under the FMA, would be contrary to the clearly-expressed intent of Congress to insure a particular form of federal participation in such decisions in the District of Columbia. Allowing Benin to proceed under local law would provide no assurance to the federal government that its interest in foreign affairs will be taken into account,

---

17. This distinction is recognized in the District's zoning law as well as in the law of other jurisdictions. Compare D.C.Code § 5–424(f), (g) (1981) and 11 D.C.M.R. § 3105.1 (1987) (BZA appellate jurisdiction) with D.C.Code § 5–424(d) (1981) and 11 D.C.M.R. § 3105.2 (1987) (BZA original jurisdiction); see also Kelley v. Board of Zoning Appeals, 126 Conn. 648, 650–54, 13 A.2d 675, 676–77 (1940); Scott v. Minnix, 95 Ga.App. 589, 590, 98 S.E.2d 196, 197 (1957); Balsam v. Jagger, 231 N.Y.S.2d 450, 452 (Sup.Ct.1962); Scott v. Quittmeyer, 200 N.Y.S.2d 886, 887 (Sup. Ct.1960); Lukens v. Zoning Board of Adjustment, 367 Pa. 608, 612, 80 A.2d 765, 767 (1951); see generally 3 A. RATHKOPF & D. RATHKOPF, THE LAW OF ZONING AND PLANNING § 37.01[6][a] (1987).

18. The act, to prohibit the location of chanceries in lower density residential areas of the District of Columbia by clarifying the zoning laws of the District of Columbia, was designed to halt such locations. Section 2 of the act amended D.C. Code § 5–418(c) (1973) to add the following phrase:

and which restriction was in effect on July 1, 1978, unless permission for each use is granted as part of an approved planned unit development for the land, application for which was filed and preliminarily approved by the Zoning Commission prior to July 1, 1978.

26 D.C. Reg. 2188 (1979).

and is, therefore, an interpretation plainly at odds with the expressed goals of Congress.

In its order of July 24, 1985, the BZA never considered the importance of reciprocity or United States international obligations.[19] The BZA treated Benin's application as it would any application for a special exception in a residential neighborhood. While it might be appropriate in another case to emphasize the unaesthetic nature of the thirty-eight foot antenna and to give the ANC concerns "great weight," it is not appropriate to do so here without also emphasizing the importance to the United States of the placement of this antenna at Benin's chancery. Regardless of whatever rights Benin may possess by virtue of its ownership of real property in the District, Benin is not merely another residential property owner. Its chancery is the headquarters of another sovereign nation's official mission to the United States. Decisions concerning its property may have international repercussions which will directly affect United States interests abroad. For this reason, we conclude that an issue of such primary importance as the furnishing of adequate communications facilities to a chancery is subject only to the provisions of the FMA.

In rejecting amicus' interpretation we are not unsympathetic to the view that the use by chanceries of federal procedures should be deferred in favor of using local procedures whenever to do so is feasible in the opinion of the State Department. Such a procedure would be consistent with federal interests in giving due recognition to the powers delegated by Congress to the District of Columbia under the D.C. Self-Government and Governmental Reorganization Act, *supra*, and might, as amicus suggested at oral argument, relieve the Office of Foreign Missions of some of its workload, although the record in the instant case would suggest the contrary. But, however sympathetic we may be to such an approach, this court cannot ignore a Congressional statute which on its face

appears clear and which, when read in light of its legislative history, reveals an absence of support for amicus' interpretation. We are unpersuaded that Congress intended to place so broad a discretion in the Secretary as would allow avoidance of § 206.

### C.

■ The final question is whether this court should decide if Benin's application is an "expansion" under § 206(a) of the FMA, or whether that decision should be made in the first instance by the special BZA established in § 206(i) of the FMA (the FMA–BZA). For the same reasons which have caused us to conclude that the FMA is the exclusive procedure available to Benin, we decline to decide this question, notwithstanding the full factual record before us. Resolution of whether chancery construction of a radio tower and antenna is an "expansion" under § 206(a) involves the exercise of judgment which Congress viewed as best made by the FMA–BZA.

Jurisdictions disagree about whether construction of a radio tower and antenna constitutes an expansion. *Compare Johnny Cake, Inc. v. Zoning Board of Appeals,* 180 Conn. 296, 301, 429 A.2d 883, 886 (1980) (upholding denial of variance to construct radio antenna mast as an extension of nonconforming use) *with Naimoli v. Zoning Hearing Board,* 56 Pa. Commw. 337, 341, 425 A.2d 36, 39–40 (1981) (holding that construction of cable television tower was merely a continuation of nonconforming communication system use); *see generally* 4 A. RATHKOPF & D. RATHKOPF, *supra* note 17, § 51.07[a] (discussing whether physical additions to buildings or structures constitute expansion). The difference in local laws undoubtedly provides an explanation for some of the disagreement. But the concept itself is viewed in different ways, as the Connecticut and Pennsylvania cases, *supra,* illustrate. Moreover, the controversy associated with the issue, as the record here makes clear, also may be a factor.

---

19. *Cf.* BZA Appeal No. 8425, Royal Siamese Government (March 15, 1966). "The Board is very mindful of the international relations of the Government of the United States and has sought in this appeal and others to accommodate those interests if it is possible to do so."

In this jurisdiction, non-conforming uses are strictly construed against a property owner. *Lenkin v. District of Columbia Board of Zoning Adjustment,* 428 A.2d 356, 358 (D.C.1981) (denial of variance involving enlargement of structure in excess of allowable percentage of lot occupancy); *Lange v. District of Columbia Board of Zoning Adjustment,* 407 A.2d 1058, 1061 (D.C.1979) (denial of special exception). Amicus maintains, however, that the FMA establishes that chancery uses, by contrast, are not disfavored. What effect this interpretation, if correct, would have on the requirement in § 206(b)(3) of the FMA, that a chancery receive the same treatment as would other office or institutional uses in the area, is unclear on the record before us. This court has recognized that even where a regular property owner is involved, the BZA has broad discretion to grant variances for non-conforming uses. *Lenkin, supra,* 428 A.2d at 360. But whether, as intervenor maintains, an "extension" under local zoning law is synonymous with an "expansion" under the FMA, is at least arguable.[20] To date the FMA–BZA has not had an opportunity to interpret the meaning of an "expansion" under § 206(a). Consequently, absent any guidance from the special entity created by Congress to resolve such chancery-related issues as are presented by Benin's application, we deem deference to the FMA–BZA to be fully warranted.

 Our decision to defer to the FMA–BZA is without prejudice to Benin's right to proceed under the FMA. Until very recently the court had not addressed the applicability of the FMA, *see, e.g., Dupont Circle, supra,* 530 A.2d at 1167 n. 8 (differing views of parties), and we now decide the question of exclusivity for the first time. Under these circumstances, Benin's reliance on the advice of the State Depart-

ment about how to proceed to obtain local permits was appropriate and provides no basis, on the record before us, to hold that Benin has waived its rights under the FMA. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (knowing and intelligent waiver required); *Van Bourg v. Nitze,* 128 U.S. App. D.C. 301, 309, 388 F.2d 557, 565 (1967) (waiver requires "intentional relinquishment of an existing right"). Questions relating to estoppel and issue preclusion, however, remain for initial decision at the administrative level. Accordingly, the order of the BZA is

*Reversed.*[21]

FMA–BZA of the word "expansion," intervenor's reliance on interpretation under local law is not compelling in view of the purposes of the FMA and its mandated criteria.

---

**20.** Intervenor's reliance on the language in the House bill as suggesting an expansion involves only buildings and not antenna towers, *see* § 206(a) of Title II, H.R. 3518 as reported by the Committee on Foreign Affairs, H.R. REP. No. 102, 97th Cong., 1st Sess., pt. 1, at 61–62 (1981), is misplaced. This language in the House bill was not adopted by the conferees. Also, in the absence of any interpretation by the special

**21.** In view of our disposition, we do not reach Benin's other contentions.