United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 9, 2001 Decided March 8, 2002 

 No. 00-7279

 Elena Sturdza, 
 Appellant

 v.

 United Arab Emirates, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 98cv02051)

 Nathan Lewin argued the cause for appellant. With him on 
the briefs were Alyza D. Lewin and David T. Shapiro.

 John A. King argued the cause and filed the brief for 
appellees Angelos Demetriou & Associates and Angelos C. 
Demetriou.

 Haig V. Kalbian and Mary M. Baker were on the brief for 
appellee The Government of the United Arab Emirates.

 Before: Henderson and Tatel, Circuit Judges, and 
Silberman, Senior Circuit Judge.

 Opinion for the Court filed by Circuit Judge Tatel.

 Concurring opinion filed by Circuit Judge Henderson.

 Tatel, Circuit Judge: This case involves a dispute between 
two architects, one of whom, Elena Sturdza, accuses the 
other, Angelos Demetriou, of stealing her design for the 
United Arab Emirates' new embassy. In addition to suing 
Demetriou and the UAE for copyright infringement, Sturdza 
charges the UAE with breach of contract, as well as with 
conspiracy to commit sex discrimination in violation of 42 
U.S.C. s 1985, and Demetriou with several torts: conspiracy 
to commit fraud, tortious interference with contract, and 
intentional infliction of emotional distress. Concluding that 
no reasonable jury could find Demetriou's design "substan-
tially similar" to Sturdza's, the district court granted sum-
mary judgment for Demetriou and the UAE on the copyright 
infringement claim. The district court also dismissed Sturd-
za's breach of contract claim, concluding that District of 
Columbia law bars such claims by architects who (like Sturd-
za) have no D.C. architecture license; her tort claims, finding 
them preempted by the federal Copyright Act; and her 
section 1985 claim, concluding that foreign governments are 
not "persons" within the meaning of the statute. We agree 
with the district court's section 1985 ruling, but have a 
different view of Sturdza's other claims. Although differ-
ences between the two embassy designs could permit a 
reasonable jury to conclude that Demetriou's design is not 
"substantially similar" to Sturdza's, because we believe there 
are sufficient similarities for the jury to reach the opposite 
conclusion, we reverse the grant of summary judgment 
of the copyright infringement claim. While 
the district court may well be correct that D.C. law bars 
Sturdza's breach of contract claim, we think the law suffi-
ciently uncertain to warrant certifying the issue to the D.C. 
Court of Appeals. Finally, because Sturdza's tort claims are 

qualitatively different from her copyright infringement claim 
and therefore not preempted, we reverse the dismissal of 
those claims.

 I.

 In 1993, the United Arab Emirates held a competition for 
the architectural design of a new embassy and chancery 
building that it planned to build in Washington, D.C. The 
UAE provided competitors with a "Program Manual" detail-
ing requirements for various aspects of the design. Accord-
ing to the cover letter accompanying the Manual, the UAE 
sought a "modern sophisticated multi-use facility expressing 
the richness and variety of traditional Arab motifs." Letter 
from Mohammed Al-Shaali, Ambassador, United Arab Emi-
rates, to Angelos Demetriou, President, Demetriou & Associ-
ates 1-2 (June 7, 1993).

 Appellant Elena Sturdza submitted a design, as did appel-
lee Angelos Demetriou and his architecture firm, Demetriou 
& Associates. A "jury" comprised of architects and civil 
engineers judged the competition entries. First Am. Compl. 
p 15; Adham Hamdan Decl. p 14. The UAE informed Sturd-
za that she had won.

 Sturdza and the UAE then began contract negotiations, 
exchanging eight contract proposals over the course of the 
next two years. In late 1994, the UAE requested some 
"minor changes" to the design and asked Sturdza to provide 
multiple, bound copies for UAE officials. First Am. Compl. 
p 23. Sturdza complied with both requests. A year later, the 
UAE asked Sturdza to perform certain "geotechnical" engi-
neering services needed to commence construction. Id. p 25. 
Complying with this request as well, Sturdza hired an engi-
neer and assisted him in addressing various technical issues. 
The UAE asked Sturdza to defer billing for these services 
because it was "about to sign the contract." Id. p 28. Ac-
cording to the UAE's Director of Public Relations, the UAE 
and Sturdza had reached agreement on all issues by late 
1995. In early 1996, the UAE made several changes to the 

draft contract, sending Sturdza a "final draft incorporating all 
the changes mandated by the Ambassador." Facsimile trans-
mission from John T. Szymkowicz, Attorney, Szymkowicz & 
Buffington, to Elena Sturdza (June 7, 1996). Although Sturd-
za informed the UAE that she agreed to these changes, the 
UAE ceased communicating with her, neither signing the 
contract nor responding to her repeated attempts to make 
contact.

 In late 1997, Sturdza learned that the UAE had presented 
an embassy design to the National Capital Planning Commis-
sion. Visiting the Commission and obtaining a copy of the 
design, Sturdza discovered not only that it was Demetriou's, 
but also that it differed from his 1993 competition entry and, 
according to Sturdza, "copied and appropriated many of the 
design features that had been the hallmark of her design." 
First Am. Compl. p 47. The UAE eventually contracted with 
Demetriou to use his revised design and began building its 
embassy.

 Sturdza filed suit in the United States District Court for 
the District of Columbia against the UAE and Demetriou. 
Her amended complaint raises four categories of claims rele-
vant to this appeal: (1) a copyright claim against the UAE 
and Demetriou (Count Three); (2) breach of contract and 
quantum meruit claims against the UAE (Counts One and 
Two); (3) tort claims for conspiracy to commit fraud, tortious 
interference with contract, and intentional infliction of emo-
tional distress against Demetriou (Counts Five, Six, and 
Seven); and (4) a claim for conspiracy to commit sex discrimi-
nation in violation of 42 U.S.C. s 1985 against the UAE 
(Count Eight). The district court granted summary judg-
ment against Sturdza on her copyright infringement, breach 
of contract, and quantum meruit claims, and dismissed under 
Federal Rule of Civil Procedure 12(b)(6) her conspiracy to 
commit fraud, tortious interference with contract, intentional 
infliction of emotional distress, and section 1985 claims. See 
Sturdza v. United Arab Emirates, No. 98-2051, slip op. at 7-9 
(D.D.C. July 22, 1999) (tort claims); Sturdza v. United Arab 

Emirates, No. 98-2051, slip op. at 11, 14 (Dec. 22, 1999) 
(breach of contract, quantum meruit, and section 1985 claims); 
Sturdza v. United Arab Emirates, No. 98-2051, slip op. at 15 
(Oct. 30, 2000) (copyright claim). Sturdza appeals. Our 
review is de novo. Wilson v. Pena, 79 F.3d 154, 160 n.1 (D.C. 
Cir. 1996) ("Our standard of review under Federal Rules 
12(b)(6) and 56 is the same: de novo.").

 II.

 We begin with a threshold issue. Claiming that certain 
filings by Sturdza and her appellate counsel have inflicted 
"irreparable prejudice," "tainted the record before this 
Court," and improperly portrayed them as "villains," the 
UAE and Demetriou moved to dismiss this appeal pursuant 
to D.C. Circuit Rule 38. Appellees' Mot. to Dismiss Appeal 
at 8-10. Under Rule 38, we may impose sanctions, including 
dismissal,

 [w]hen any party to a proceeding before this court or any 
 attorney practicing before this court fails to comply with 
 the FRAP or these rules, or takes an appeal or files a 
 petition or motion that is frivolous or interposed for an 
 improper purpose, such as to harass or to cause unneces-
 sary delay[.]
 
D.C. Cir. R. 38. We deferred ruling on the motion to dismiss 
until after oral argument. We now deny the motion.

 The filings about which the UAE and Demetriou complain 
began after Sturdza's appellate counsel, Nathan Lewin, sub-
mitted his opening brief. In several pro se motions and other 
documents, Sturdza accused Lewin of failing to follow her 
directions and sought to bring to our attention her own view 
of Demetriou's and the UAE's conduct. In one motion, 
Sturdza attempted to add "critical information" to her appel-
late brief that she said was "either missing or false." Appel-
lant's Pro Se Mot. to File Corrections at 1. Denying that 
motion, we reminded Sturdza that "[a]ppellant has counsel 
whom she has retained and thus is her representative in this 
appeal.... So long as appellant is represented by counsel, 
the attorney speaks on her behalf before this court." Order 

of the United States Court of Appeals for the District of 
Columbia Circuit at 1 (Aug. 29, 2001) (No. 00-7279).

 Undeterred, Sturdza made additional pro se filings accus-
ing Lewin of failing to represent her properly. For example, 
in a "motion for reconsideration," she charged that Lewin 
"intentionally delayed submissions for [her] review ... to 
deprive her of adequate time to act," reiterating that her 
appellate brief contains "false statements, misleading state-
ments and omissions [of] important facts." Appellant's Pro 
Se Mot. for Recons. at 2.

 Lewin filed several affidavits in which he denied Sturdza's 
accusations and described his efforts to consult with Sturdza 
regarding her appeal. Lewin also submitted copies of corre-
spondence illustrating his efforts to communicate with Sturd-
za. In one such letter, Lewin explained that "based on [his] 
professional judgment and experience," he decided to omit 
certain material from the appellate brief, namely, "poor legal 
arguments, unsubstantiated factual allegations and other ma-
terial that was not suitable for the brief and would have 
reduced its persuasiveness[.]" Letter from Nathan Lewin, 
Attorney, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, to 
Elena Sturdza 2-3 (Sept. 7, 2001). Lewin attached to his 
reply brief a copy of Sturdza's handwritten account of the 
merits of her case--a document containing numerous strongly 
worded allegations against Demetriou and the UAE, her 
district court counsel (not Lewin), and the district court 
judge. See Appellant's Reply Br. Addendum at 8-9 (stating 
among other things that the appellees engaged in a "planned 
theft" of Sturdza's design and that the UAE had "exercise[d] 
its power over [Sturdza's trial] counsel and the U.S. judge"). 
Explaining why he included this material, Lewin stated, "I do 
not wish to be a barrier to Ms. Sturdza's effort to be heard 
individually--even on matters that I personally believe are 
baseless or do not warrant presentation to the Court." Lew-
in Aff. (Oct. 1, 2001) p 10. Finally, Lewin expressed his 
opinion that the pressures created by this litigation had 
affected Sturdza psychologically and led to her pro se filings, 
to which Sturdza responded: "[M]y emotional instability, if 

any, is caused by the distress inflicted by all the defendants 
... and by the mystery in which my counsel has deepened 
me." Sturdza Aff. (Sept. 21, 2001) p 7.

 In our view, these filings fall far short of Rule 38 sanctiona-
ble behavior. To begin with, the UAE's and Demetriou's 
suggestion that our view of this case could be influenced by 
either Sturdza's pro se filings or Lewin's explanations is 
preposterous. This court is not a jury requiring protection 
from wayward comments. Moreover, none of the circum-
stances that have led us to impose Rule 38 sanctions exist 
here. While we advised Sturdza that only counsel spoke for 
her so long as she was represented, neither she nor Lewin 
violated an express court order. Cf., e.g., CNPQ Conseiho 
Nacional de Desenvolvimiento Cientifico e Technologico v. 
Fontes, No. 95-7067, 1996 WL 680208, at *1 (D.C. Cir. Oct. 4, 
1996), clarified on reh'g, id. (Dec. 12, 1996) (dismissing appeal 
under Rule 38 in part because appellant refused to comply 
with court directive to file response to order to show cause). 
Nor have the UAE and Demetriou offered any grounds to 
conclude that Sturdza's pro se filings or Lewin's responses 
were "frivolous or interposed for an improper purpose." D.C. 
Cir. R. 38; cf., e.g., Whitehead v. Metro Goldwyn Mayer 
Studio, Inc., No. 00-7164, 2001 WL 135848, at *1 (D.C. Cir. 
Jan. 19, 2001) (assessing attorneys' fees and costs where 
appeal was "frivolous and appellees provide[d] evidence that 
appellant's claims [we]re presented in bad faith"). To the 
contrary, these filings merely represent a worried client's 
misguided but not improperly motivated attempt to express 
her concerns about her case, and her lawyer's responses. 
Finally, the UAE and Demetriou allege no want of prosecu-
tion. Cf., e.g., Ray v. Reno, No. 96-5005, 1996 WL 761944, at 
*1 (D.C. Cir. Dec. 26, 1996) (dismissing appeal for failure to 
prosecute).

 Not only does nothing in the challenged filings warrant 
dismissal, but we believe Lewin proceeded with the utmost 
propriety, delicately balancing his ethical obligations to his 
client and his responsibilities as an officer of this court. 
Lewin made clear to Sturdza that although she could dis-
charge him, so long as he remained counsel he "retained the 
final and ultimate responsibility to determine the contents" of 

the briefing. Lewin Aff. (Oct. 1, 2001) p 2. In doing so, 
Lewin carefully explained to Sturdza why he thought the 
additional arguments she wished to make were without merit 
and why the material she wanted added to the Joint Appendix 
should not be included. At the same time, to fully protect his 
client's interests, Lewin made sure we were fully aware of her 
position. This is precisely how appellate counsel should 
behave; indeed, we expect all lawyers practicing in this court 
to resist a client's desire to make "poor legal arguments" or 
"unsubstantiated factual allegations." Letter from Nathan 
Lewin, supra p. 6, at 2-3; see also D.C. R. Prof'l Conduct 
3.1 ("A lawyer shall not bring or defend a proceeding, or 
assert or controvert an issue therein, unless there is a basis 
for doing so that is not frivolous...."); D.C. Cir. R. app. II 
R. I (adopting D.C. Code of Professional Conduct). We thus 
turn to the merits of this appeal.

 III.

 To prevail on a copyright claim, a plaintiff must prove both 
ownership of a valid copyright and that the defendant copied 
original or "protectible" aspects of the copyrighted work. 
Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348, 
361 (1991). "Not all copying, however, is copyright infringe-
ment." Id. at 361. The plaintiff must show not only that the 
defendant actually copied the plaintiff's work, but also that 
the defendant's work is "substantially similar" to protectible 
elements of the plaintiff's work. See, e.g., Boisson v. Banian, 
Ltd., 273 F.3d 262, 267-68 (2d Cir. 2001); Concrete Mach. Co. 
v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 
1988); see generally 4 Melville B. Nimmer & David Nimmer, 
Nimmer on Copyright s 13.01[B], at 13-8 to 13-10 (2001) 
(explaining that while few courts clearly differentiate between 
actual copying and substantial similarity, both are clearly 
required, and the latter inquiry concerns whether actual 
copying is legally actionable). In their motions for summary 
judgment, the UAE and Demetriou disputed neither Sturd-
za's ownership of a valid copyright nor that Demetriou actual-
ly copied Sturdza's design. Instead they argued, as they do 
here, that Sturdza cannot prove substantial similarity.

 The substantial similarity inquiry consists of two steps. 
The first requires identifying which aspects of the artist's 
work, if any, are protectible by copyright. "[N]o author may 
copyright facts or ideas. The copyright is limited to those 
aspects of the work--termed 'expression'--that display the 
stamp of the author's originality." Feist Publ'ns, 499 U.S. at 
350 (internal quotation marks and citation omitted) (alteration 
in original); see also 17 U.S.C. s 102(b) ("In no case does 
copyright protection for an original work of authorship extend 
to any idea, procedure, process, system, method of operation, 
concept, principle, or discovery...."). Using Shakespeare as 
an example, Judge Learned Hand explained the distinction 
between protectible expression and unprotectible ideas:

 If Twelfth Night were copyrighted, it is quite possible 
 that a second comer might so closely imitate Sir Toby 
 Belch or Malvolio as to infringe, but it would not be 
 enough that for one of his characters he cast a riotous 
 knight who kept wassail to the discomfort of the house-
 hold, or a vain and foppish steward who became amorous 
 of his mistress. These would be no more than Shake-
 speare's "ideas" in the play, as little capable of monopoly 
 as Einstein's Doctrine of Relativity, or Darwin's theory 
 of the Origin of Species.
 
Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 
1930); see also, e.g., Country Kids 'N City Slicks, Inc. v. 
Sheen, 77 F.3d 1280, 1286 (10th Cir. 1996) (holding that 
"wooden form of the traditional paper doll" is idea not 
expression). "[N]o principle," Judge Hand said, "can be 
stated as to when an imitator has gone beyond copying the 
'idea,' and has borrowed its 'expression.' Decisions must 
therefore inevitably be ad hoc." Peter Pan Fabrics, Inc. v. 
Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

 Also relevant to this case, copyright protection does not 
extend to what are known as scEnes A faire, i.e., "incidents, 
characters or settings which are as a practical matter indis-
pensable, or at least standard, in the treatment of a given 
topic," Atari, Inc. v. North Am. Philips Consumer Elecs. 
Corp., 672 F.2d 607, 616 (7th Cir. 1982) (internal quotation 

marks and citation omitted), or elements that are "dictated by 
external factors such as particular business practices," Com-
puter Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 
F.3d 396, 401 (5th Cir. 2000). For example, because "[f]oot 
chases and the morale problems of policemen, not to mention 
the familiar figure of the Irish cop, are venerable and often-
recurring themes of police fiction[,] ... they are not copy-
rightable." Walker v. Time Life Films, Inc., 784 F.2d 44, 50 
(2d Cir. 1986); see also Computer Mgmt., 220 F.3d at 401 
(holding that computer program features dictated by "com-
puter manufacturer design standards" were scEnes A faire).

 Once unprotectible elements such as ideas and scEnes A 
faire are excluded, the next step of the inquiry involves 
determining whether the allegedly infringing work is "sub-
stantially similar" to protectible elements of the artist's work. 
"Substantial similarity" exists where "the accused work is so 
similar to the plaintiff's work that an ordinary reasonable 
person would conclude that the defendant unlawfully approp-
riated the plaintiff's protectible expression by taking material 
of substance and value." Country Kids, 77 F.3d at 1288 
(internal quotation marks and citation omitted). Substantial 
similarity turns on the perception of the "ordinary reasonable 
person" or "ordinary observer," id. As the Second Circuit 
explained:

 [t]he plaintiff's legally protected interest is ... his inter-
 est in the potential financial returns from his [work] 
 which derive from the lay public's approbation of his 
 efforts. The question, therefore, is whether defendant 
 took from plaintiff's works so much of what is pleasing to 
 the ... lay ... audience ... that defendant wrongfully 
 appropriated something which belongs to the plaintiff.
 
Arnstein v. Porter, 154 F.2d 464, 473 (2d Cir. 1946).

 The substantial similarity determination requires compari-
son not only of the two works' individual elements in isolation, 
but also of their "overall look and feel." Boisson, 273 F.3d at 
272 (internal quotation marks and citation omitted). "[A]n 
allegedly infringing work is considered substantially similar 
to a copyrighted work if the ordinary observer, unless he set 
out to detect the disparities, would be disposed to overlook 

them, and regard their aesthetic appeal as the same." Id. 
(internal quotation marks and citation omitted). Put another 
way, "[t]he touchstone of the analysis is the overall similari-
ties rather than the minute differences between the two 
works." Country Kids, 77 F.3d at 1288 (internal quotation 
marks and citation omitted). Considering the works as a 
whole is particularly important because protectible expression 
may arise through the ways in which artists combine even 
unprotectible elements. For example, while color is not 
protectible, the manner in which an artist "select[s], coordi-
nate[s], and arrange[s]," color may be. Boisson, 273 F.3d at 
272; see also Matthews, 157 F.3d at 28 (observing that a 
"collage of newspaper headlines," not themselves protectible, 
if "juxtaposed in some highly creative and original fashion" 
could constitute protectible expression).

 Finally, and of particular importance to this case, "[b]e-
cause substantial similarity is customarily an extremely close 
question of fact, summary judgment has traditionally been 
frowned upon in copyright litigation." A.A. Hoehling v. 
Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980); 
see also Wickham v. Knoxville Int'l Energy Exposition, Inc., 
739 F.2d 1094, 1097 (6th Cir. 1984) ("[S]ummary judgment 
... is a practice to be used sparingly in copyright infringe-
ment cases."). Of course, summary judgment for a copyright 
defendant remains appropriate if the works are so dissimilar 
as to protectible elements that no reasonable jury could find 
for the plaintiff on the question of substantial similarity. See 
Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994) (setting forth 
general summary judgment rule); Williams v. Crichton, 84 
F.3d 581, 589 (2d Cir. 1996) (affirming grant of summary 
judgment for copyright defendant because "any similarity in 
the theme of the parties' works relates to the unprotectible 
idea of a dinosaur zoo," and "[o]nce one goes beyond this level 
of abstraction, the similarity in themes disappears").

 In assessing whether Sturdza's claim of substantial similar-
ity presents a genuine issue of material fact, the district court 
first eliminated from consideration those elements of Deme-
triou's 1997 design that were present in his 1993 competition 
submission. These include the building's overall volume, 

backyard garden, and atrium. See Sturdza, No. 98-2051, slip 
op. at 11 (Oct. 30, 2000) (listing elements). The district court 
excluded these features because Sturdza's amended complaint 
alleges that Demetriou copied her design after preparing his 
original, 1993 competition entry. Because Sturdza does not 
challenge this aspect of the summary judgment decision, we 
too will exclude these elements of Demetriou's 1997 design 
from our consideration.

 The district court next "filter[ed] out" those elements of 
Sturdza's design it viewed as unprotectible ideas: "domes, 
wind-towers, parapets, arches, and Islamic patterns." Id. at 
6, 12. According to the district court, Sturdza's expression of 
these elements, but not her use of them, is protectible. We 
agree with this aspect of the district court's decision. In and 
of themselves, domes, wind-towers, parapets, and arches rep-
resent ideas, not expression. Cf. Wickham, 739 F.2d at 1097 
(holding that tower structure is idea not copyrightable ex-
pression); Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 
205 F.3d 137, 143 (4th Cir. 2000) (holding that island or 
peninsula-shaped bar bisecting seating area with booths on 
one side and stool seating on other "is nothing more than a 
concept"). Indeed, to hold otherwise would render basic 
architectural elements unavailable to architects generally, 
thus running afoul of the very purpose of the idea/expression 
distinction: promoting incentives for authors to produce origi-
nal work while protecting society's interest in the free flow of 
ideas. See Feist Publ'ns, 499 U.S. at 349-50. We also agree 
that "Islamic" patterns are not protectible, though we would 
characterize them as scEnes A faire dictated by the UAE's 
desire that the building "express[ ] the richness and variety of 
traditional Arab motifs." Particular shapes such as diamonds 
or circles that comprise a given pattern, however, do consti-
tute ideas.

 Proceeding item by item, the district court then meticulous-
ly compared how the concepts of domes, wind-towers, para-
pets, arches, and decorative patterns (referred to by the 
district court as "Islamic" patterns) are expressed in the two 
designs. "[A]t the level of protectable expression," the dis-

trict court concluded, "the designs are decidedly different." 
Sturdza, No. 98-2051, slip op. at 13 (Oct. 30, 2000).

 Here we part company with the district court. Although 
we agree that Demetriou's design differs from Sturdza's, we 
think the district court overlooked several important respects 
in which Demetriou's design expresses particular architectur-
al concepts quite similarly to Sturdza's. We also see signifi-
cant similarities in the "overall look and feel" of the two 
designs. To help explain these two points, we attach as 
appendices to this opinion selected "elevations," i.e., views, of 
Sturdza's and Demetriou's designs. Appendices A and B 
show front and side elevations of Sturdza's design. Appendi-
ces C and D show front and side elevations of Demetiou's 
1997 design.

 We begin with the ways in which Demetriou's expression of 
architectural concepts mirrors Sturdza's. Consider the 
domes. Although we agree that Demetriou's dome differs 
from Sturdza's in some respects--Demetriou's is opaque and 
positioned toward the front of the building, while Sturdza's 
rises directly over the building's central section and is made 
of "glass[,] ... allowing light in through the pattern," Pl.'s 
Suppl. Answer to Def. Demetriou's Interrogs. at 4--in other 
respects Demetriou's dome appears quite similar. Viewed 
from the front, both domes appear to rise from the center and 
toward the front of the buildings. Both domes rise to essen-
tially the same height, correspond in width to the buildings' 
midsections, and taper gently upward to a point. Although 
the domes have different decorative patterns, the patterns 
create a similar effect. Sturdza encircles her dome with 
three bands of pointed arches, largest at the dome's base and 
becoming progressively smaller toward its top. Her arches' 
decreasing size and pointed shape create a feeling of upward 
movement from the dome's base toward its top. Demetriou 
creates a similar effect by covering his dome with diamonds 
whose upper points correspond to Sturdza's pointed arches 
and that (like Sturdza's arches) become progressively smaller 
toward the top of the dome. Finally, Sturdza gives her dome 
a ribbed effect by raising the edges of the arches above the 

dome's surface; Demetriou creates a similar effect by accent-
ing his diamonds' edges.

 Like the domes, Demetriou's wind-towers differ in some 
respects from Sturdza's: Sturdza's are three-dimensional, 
emerge from the building's roof, and are decorated with 
diamond patterning; Demetriou's are essentially two-
dimensional extensions of the building's front facade and are 
decorated with three vertical bands. Viewed from the front, 
however, the wind-towers appear quite similar in terms of 
size and placement. Indeed, because the wind-towers are 
essentially the same height and width and rise on either side 
of the domes, they create extremely similar building contours. 
Moreover, by placing diamonds atop the three vertical bands, 
Demetriou creates a decorative effect similar to Sturdza's.

 We agree with the district court that the parapets, which 
run along the length of each building's upper perimeter, have 
different decorative patterns: carved-out diamonds (Sturd-
za's) as compared to vertical notches (Demetriou's). In other 
respects, however, the parapets seem quite similar. Like 
Sturdza's design, Demetriou's incorporates narrow vertical 
columns that rise from the ground to just above the parapet's 
upper edge, subdividing the parapet and marking it with 
regularly spaced protrusions (the columns' tips). In addition, 
both parapets rise to a greater height over the buildings' 
midsections (just beneath the domes, when viewed from the 
front). In combination, these characteristics give Deme-
triou's parapet a similar look and feel to Sturdza's and 
contribute to the marked similarity of the two buildings' 
contours.

 Demetriou's arches, as the district court pointed out, differ 
in important ways from Sturdza's: Demetriou's are wide and 
low, appear on the ground level only, and have interiors 
decorated with latticework comprised of shapes somewhere 
between circles and diamonds; Sturdza's are high and nar-
row, appear on both the ground and third-floor levels, and 
have interiors decorated with latticework comprised of dia-
mond shapes. Yet even with these differences, Demetriou 
uses arches to create an effect similar to the effect created by 

Sturdza's arches. The portals of both buildings consist of 
large arches flanked on either side by smaller ones. This, 
together with the fact that the arches in both designs are 
pointed, creates a similar, pyramid-like cluster of arches at 
the centers of the buildings. Demetriou's latticework pat-
terning adds to the similar feel. In both designs, the lattice-
work consists of a web of small shapes surrounding larger, 
more open shapes at the center of each arch. Sturdza 
creates this effect by placing a few open diamonds at the 
center of her arches, surrounding them with diamonds bisect-
ed with vertical and horizontal lines. Demetriou creates a 
similar effect by placing a large, open, circular shape at the 
center of each arch, surrounded by smaller, circular shapes.

 The final concept--decorative patterning that covers the 
facades of the two buildings--is the idea Demetriou expresses 
most differently. As the district court pointed out, Deme-
triou's patterning has sixteen-sided stars on the upper levels 
and shapes somewhere between a circle and a diamond on the 
ground level; Sturdza's has diamond shapes throughout. 
Demetriou also uses significantly less patterning overall than 
Sturdza, who covers the entire facade of her building with 
decoration. Even with these differences, however, we see a 
significant similarity: like Sturdza, Demetriou covers his 
building's facade with a grid of diamonds that creates a 
diamond motif and emphasizes the facade's division into hori-
zontal and vertical planes.

 Moving on to our second basis for questioning the district 
court's conclusion that the designs are "decidedly different," 
id. at 13, we see no indication that, in addition to comparing 
the ways in which the two architects express individual 
concepts, the district court considered the two buildings' 
"overall look and feel." Boisson, 273 F.3d at 272. Examin-
ing the two designs ourselves, we are struck by the significant 
extent to which Demetriou's design resembles Sturdza's. 
The size, shape, and placement of Demetriou's wind-towers, 
parapets, and pointed domes, when viewed from the front, 
give his building a contour virtually identical to Sturdza's. 
Contributing to the similarity in overall look and feel, both 

buildings have a pyramid-like clustering of pointed arches 
around the front entrances, prominent horizontal bands and 
vertical columns demarcating the windows, slightly protrud-
ing midsections, diamond grids, and similar latticework pat-
terning inside the arches. Finally, Demetriou achieves the 
"Islamic" effect sought by the UAE by expressing and com-
bining his wind-towers, arches, dome, parapet, and decorative 
patterning in ways quite similar to Sturdza's expression and 
combination of these elements.

 To sum up, we think Demetriou's design, though different 
in some ways from Sturdza's (as the district court thought), is 
sufficiently similar with respect to both individual elements 
and overall look and feel for a reasonable jury to conclude 
that the two are substantially similar. Unless the jury "set 
out to detect the disparities" between the two works, it might 
well "be disposed to overlook them, and regard their aesthetic 
appeal as the same." Boisson, 273 F.3d at 272 (internal 
quotation marks and citation omitted). Because Sturdza's 
copyright claim presents an extremely close question, and 
because "summary judgment has traditionally been frowned 
upon in copyright litigation," A.A. Hoehling, 618 F.2d at 977, 
we will reverse the grant of summary judgment.

 We conclude with some observations about two evidentiary 
issues which, though we had no need to resolve at this stage 
of the proceedings, may well arise on remand. One concerns 
the differences between Demetriou's 1997 design and his 1993 
competition entry (Appendix E). His original design has a 
distinctly boxy, modern office building look, round dome, little 
decoration, and no wind-towers, arches, or parapet. Much 
less boxy and modern, Demetriou's revised design, like Sturd-
za's, incorporates arches, wind-towers, a parapet, a pointed 
dome, and considerably more decorative patterning. Accord-
ing to Sturdza, these changes support her claim of substantial 
similarity. Demetriou and the UAE claim the changes relate 
only to the question of actual copying.

 The other evidentiary issue concerns the use of expert 
evidence. In opposition to Demetriou's motion for summary 

judgment, Sturdza offered two expert declarations--one from 
a professor of Islamic art and architecture and another from 
a practicing architect. Demetriou moved to exclude these 
declarations as irrelevant to the question of substantial simi-
larity. Declining to rule on the declarations' admissibility, 
the district court disregarded them as "conclusory and unin-
formative." Sturdza, No. 98-2051, slip op. at 6 n.4 (Oct. 30, 
2000). On appeal, Sturdza insists that the declarations are 
relevant.

 These evidentiary issues are complex and novel. Begin-
ning with the first, although Demetriou and the UAE concede 
that the changes are clearly relevant to the question of actual 
copying, we are not at all sure why the changes in Deme-
triou's design support Sturdza's claim of substantial similari-
ty: the question is whether Demetriou's end product (his 
revised design) is substantially similar to Sturdza's, not how it 
got that way. At oral argument, however, Sturdza's counsel 
theorized that the two versions could inform the jury about 
the "range of possibilities" available to Demetriou and there-
by help the jury resolve the substantial similarity issue. Tr. 
of Oral Arg. at 54. Unfortunately, neither party identifies 
any authority on this intriguing question, nor have we found 
any ourselves.

 By contrast, the use of expert testimony in copyright cases 
has received widespread judicial attention. Until recently, 
expert evidence was permitted only to help juries determine 
"whether ... the alleged infringer used the copyrighted work 
in making his own" (actual copying), not to determine "wheth-
er ... the copying was ... an unlawful appropriation" (sub-
stantial similarity). Whelan Assocs. v. Jaslow Dental Lab., 
Inc., 797 F.2d 1222, 1232 (3d Cir. 1986) (internal quotation 
marks and citation omitted); see also Arnstein, 154 F.2d at 
468 (setting forth traditional rule proscribing expert evidence 
at "unlawful appropriation" step). A growing number of 
courts now permit expert testimony regarding substantial 
similarity in cases involving computer programs, reasoning 
that such testimony is needed due to the "complexity and 
unfamiliarity [of computer programs] to most members of the 
public." Whelan, 797 F.2d at 1232; see also Computer 

Assocs., Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 713-14 (2d Cir. 
1992) (permitting expert evidence on substantial similarity in 
computer program infringement case); Fed. R. Evid. 702 
(stating that expert evidence is admissible when "scientific, 
technical, or other specialized knowledge will assist the trier 
of fact to understand the evidence or to determine a fact in 
issue"). The Fourth Circuit has held that this more flexible 
approach to expert evidence could apply to a highly special-
ized musical arrangement. See Dawson v. Hinshaw Music 
Inc., 905 F.2d 731, 736-38 (4th Cir. 1990) (remanding to the 
district court to determine if the audience for a spiritual 
composition was sufficiently specialized--and the lay audience 
therefore sufficiently unfamiliar with such works--to warrant 
expert evidence on the substantial similarity question). Nei-
ther we nor any other circuit, however, has considered wheth-
er expert evidence is admissible to show substantial similarity 
of architectural works, nor has any circuit other than the 
Fourth approved the use of such evidence outside the com-
puter program context. Cf. Computer Assocs., 982 F.2d at 
713-14 ("[W]e do not intend to disturb the traditional role of 
lay observers in judging substantial similarity in copyright 
cases that involve the aesthetic arts, such as music, visual 
works or literature.").

 In addition to their novelty, these two issues share another 
common characteristic: though raised, they are virtually un-
briefed. Because of this, and because of the importance of 
both issues to copyright law, we think it best to allow the 
parties to develop them under the capable direction of the 
district court. If necessary, we can revisit either or both 
issues in a subsequent appeal, with the benefit of full briefing.

 IV.

 We turn next to Sturdza's breach of contract and quantum 
meruit claims. In Count One of the amended complaint, 
Sturdza alleges that the UAE breached its contract by "inten-
tionally failing to memorialize the final contract ... concern-
ing which substantial performance had already commenced; 

... awarding the contract for the design and construction of 
the Embassy to ... Demetriou ... while simultaneously 
holding itself out to be engaged in a good faith agreement 
with ... [Sturdza]; and ... failing to pay [Sturdza] her fee 
or any portion thereof, including ... for work specifically 
requested of her by ... [the] UAE." First Am. Compl. p 60. 
Count Two seeks quantum meruit recovery for Sturdza's 
preparation of the Embassy design as well as for services 
performed after being declared the competition winner. See 
id. p p 63-64. The district court granted summary judgment 
for the UAE, concluding that D.C. law bars Sturdza from 
obtaining contractual or quasi-contractual recovery because 
she had no license to practice architecture in the District 
either at the time she contracted with the UAE or when she 
performed the services for which she seeks compensation.

 The UAE argues that we may affirm on either of two 
alternative grounds. First, it claims that because it did not 
execute a written agreement, it never formed a contract with 
Sturdza. The D.C. Court of Appeals, however, has squarely 
held that although "[m]utual assent to a contract ... is most 
clearly evidenced by the terms of a signed written agreement, 
... such a signed writing is not essential to the formation of a 
contract." Davis v. Winfield, 664 A.2d 836, 837 (D.C. 1995).

 Second, echoing the district court, the UAE argues that 
D.C. licensing law bars Sturdza from obtaining the recovery 
she seeks. The D.C. Code provides that "no unlicensed 
person shall engage, directly or indirectly, in the practice of 
architecture in the District." D.C. Code s 47-2853.63 (2001) 
(formerly codified at D.C. Code s 2-261 (1981)). The "prac-
tice of architecture" means "rendering or offering to render 
services in connection with the design and construction, en-
largement, or alteration of a structure.... [including] plan-
ning and providing studies, designs, drawings, specifications, 
and other technical submissions, and the administration of 
construction contracts." D.C. Code s 47-2853.61 (2001) (for-
merly codified at D.C. Code s 2-241 (1981)). The D.C. Court 
of Appeals has held that "a contract made in violation of a 
licensing statute that is designed to protect the public will 
usually be considered void and unenforceable." Truitt v. 

Miller, 407 A.2d 1073, 1079 (D.C. 1979). A person violating 
such a statute may recover in neither contract nor quasi-
contract. See, e.g., Cevern v. Ferbish, 666 A.2d 17, 19-20 
(D.C. 1995) (holding that home improvement contractor could 
not recover in contract or quasi-contract where the contractor 
accepted advance payment while unlicensed, in violation of 
the home improvement licensing statute); Saul v. Rowan 
Heating and Air Conditioning, Inc., 623 A.2d 619, 621-22 
(D.C. 1993) (holding that air conditioning contractor could not 
recover for services provided where the contractor was unli-
censed at the time he entered into contract and performed 
work, in violation of the refrigeration/air conditioning services 
licensing statute).

 Sturdza argues that her failure to have a D.C. architecture 
license does not bar her contract and quasi-contract claims. 
According to Sturdza, her work falls within a statutory excep-
tion permitting unlicensed architects to "prepare technical 
submissions or ... administ[er] ... construction contracts 
under the direct supervision of an architect licensed in the 
District." D.C. Code s 2-262(3) (1981) (repealed by Second 
Omnibus Regulatory Reform Amendment Act of 1998 s 1235, 
46 D.C. Reg. 3142, 3212). We disagree. Although Sturdza 
apparently did collaborate to some extent with a D.C. archi-
tect, see Sturdza Aff. (Aug. 20, 1999) p 2 ("At all times 
pertinent hereto, I was associated and worked with ... an 
architect licensed in the District of Columbia...."), she never 
alleges that she was under his direct supervision nor, accord-
ing to the amended complaint, was her work limited to 
"technical submissions" or "administ[ering] ... construction 
contracts." Sturdza next argues that she only seeks to 
enforce a contract for future services and that she would have 
obtained a D.C. license by the time she actually rendered 
those services. This argument is equally without merit, for it 
directly contradicts her allegation that while unlicensed she 
"substantial[ly] perform[ed]" the contract upon which she 
seeks to recover. First Am. Compl. p 60. Finally, Sturdza 
argues that application of the D.C. licensing requirement 
would violate the Foreign Missions Act, 22 U.S.C. s 4301. 
Not only does she fail to tell us which provision of the statute 

she thinks is implicated, but she relies on a case dealing with 
an entirely different situation: the D.C. zoning board's effort 
to prevent a foreign chancery from constructing a radio tower 
for diplomatic communications. See Embassy of Benin v. 
District of Columbia Bd. of Zoning Adjustment, 534 A.2d 310 
(D.C. 1987).

 Returning to the licensing principles enunciated by the 
D.C. Court of Appeals, we are inclined to agree with the 
district court that D.C. law precludes Sturdza from obtaining 
contractual or quasi-contractual recovery. Sturdza had no 
D.C. license and, as her amended complaint concedes, she 
went beyond submitting bids and actually performed architec-
tural services--in her own words, "substantial[ly] per-
form[ed]" the contract. First Am. Compl. p 60; cf., e.g., Saul, 
623 A.2d at 620 (holding contractor barred from recovery 
because he contracted and performed work without license). 
That said, we are mindful that a "federal court ... should 
normally decline to speculate on ... a question of local 
doctrine." East v. Graphic Arts Indus. Joint Pension Trust, 
107 F.3d 911, 911 (D.C. Cir. 1997) (quoting Delahanty v. 
Hinckley, 845 F.2d 1069, 1070 (D.C. Cir. 1988)). Although 
decades ago, the D.C. Court of Appeals held that an architect 
who failed to comply with a then-existing license renewal 
provision could not recover for services performed during the 
period in which his license had lapsed, see Holiday Homes, 
Inc. v. Briley, 122 A.2d 229, 231-32 (D.C. 1956), that court 
has never expressly determined whether the provision at 
issue here bars unlicensed architects from enforcing their 
contracts or recovering in quantum meruit. Nor has the D.C. 
Court of Appeals considered the implications (if any) of a 
statutory exception that permits architects licensed elsewhere 
to "agree to perform or represent that he or she is able to 
perform any of the services involved in the practice of archi-
tecture, provided that the architect shall not perform any of 
the services involved in the practice of architecture until 
licensed under this act." D.C. Code s 2-262(6) (1981) (re-
pealed by Second Omnibus Regulatory Reform Amendment 
Act of 1998 s 1235, 46 D.C. Reg. 3142, 3212). Although this 
exception was repealed since the events at issue here, the 

basic licensing framework for architects remains unchanged. 
See D.C. Code s 47-2853.63 (2001) (prohibiting unlicensed 
persons from engaging in practice of architecture in the 
District).

 We thus think the wisest course of action is to certify this 
issue to the D.C. Court of Appeals. See D.C. Code 
s 11-723(a) (2001) ("[A] Court of Appeals of the United 
States" may certify "questions of law" to the D.C. Court of 
Appeals when "it appears to the certifying court [that] there 
is no controlling precedent in the decisions of the D.C. Court 
of Appeals."). District of Columbia law is " 'genuinely uncer-
tain,' " Dial A Car, Inc. v. Transp., Inc., 132 F.3d 743, 746 
(D.C. Cir. 1998) (quoting Tidler v. Eli Lilly & Co., 851 F.2d 
418, 426 (D.C. Cir. 1988)), and this case presents a question of 
" 'extreme public importance,' " id. at 746 (quoting Joy v. Bell 
Helicopter Textron, Inc., 999 F.2d 549, 563-64 (D.C. Cir. 
1993)). We assume that architects throughout the country 
(perhaps even around the world) unlicensed to practice in the 
District often submit bids to perform architectural services in 
this city of embassies, monuments, and public buildings. 
Precisely how D.C. law applies to this unique characteristic of 
Washington, D.C. and its economy is a question best resolved 
by the D.C. Courts. Accordingly, we will certify the following 
question to the D.C. Court of Appeals:

 Under District of Columbia law, is an architect barred 
 from recovering on a contract to perform architectural 
 services in the District or in quantum meruit for archi-
 tectural services rendered in the District because the 
 architect began negotiating for the contract, entered into 
 the contract, and/or performed such services while li-
 censed to practice architecture in another jurisdiction, 
 but not in the District?
 
 V.

 The district court dismissed Counts Five, Six, and Seven, 
which allege that Demetriou conspired to commit fraud, tor-
tiously interfered with Sturdza's contract, and intentionally 

inflicted emotional distress, on the ground that all three 
claims are preempted under Section 301 of the Copyright Act. 
That section provides:

 [A]ll legal or equitable rights that are equivalent to any 
 of the exclusive rights within the general scope of copy-
 right as defined by section 106 in works of authorship 
 that are fixed in a tangible medium of expression and 
 come within the subject matter of copyright as specified 
 by sections 102 and 103 ... are governed exclusively by 
 this title.... [N]o person is entitled to any such right 
 or equivalent right in any such work under the common 
 law or statutes of any State.
 
17 U.S.C. s 301(a). In "broadly pre-empting state statutory 
and common-law copyright regulation," Cmty. for Creative 
Non-Violence v. Reid, 490 U.S. 730, 740 (1989), Congress 
sought to "enhanc[e] predictability and certainty of copyright 
ownership," id. at 749, by establishing a "uniform method for 
protecting and enforcing certain rights in intellectual proper-
ty," Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995). 
That said, "[n]othing in ... [the Copyright Act] annuls or 
limits any rights or remedies under the common laws or 
statutes of any State with respect to ... [a work] that does 
not come within the subject matter of copyright ... [or] 
activities violating legal or equitable rights that are not 
equivalent to any of the exclusive rights within the general 
scope of copyright." 17 U.S.C. s 301(b)(1), (3). In other 
words, preemption has both "subject matter" and "equivalen-
cy" requirements: the copyrighted work must be the type of 
work protected by copyright law and the state law right must 
be equivalent to a right protected by the Copyright Act. See 
Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir. 
2001).

 Architectural designs unquestionably fall within the "sub-
ject matter" of copyright. Indeed, the Copyright Act ex-
pressly mentions "architectural works." See 17 U.S.C. 
s 102(a)(8). Preemption in this case thus turns on whether 
Counts Five, Six, and Seven assert state law rights "equiva-
lent" to rights protected by the Copyright Act, namely, the 

"exclusive rights" of a copyright owner "to reproduce the 
copyrighted work[,] ... to prepare derivative works[,] ... to 
distribute copies ... of the copyrighted work to the public by 
sale or other [means,] ... to perform the copyrighted work 
publicly[,] ... [and] to display the copyrighted work publicly." 
17 U.S.C. s 106. State law protects rights "equivalent" to an 
"exclusive right[ ] within the general scope of copyright" 
where the "state law may be abridged by an act which, in and 
of itself, would infringe one of those exclusive rights." Har-
per & Row, Publishers, Inc. v. Nation Enters., 723 F.2d 195, 
200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 
(1985). Put another way, "if an extra element is required 
instead of or in addition to the acts of reproduction, perfor-
mance, distribution or display in order to constitute a state-
created cause of action, there is no preemption, provided that 
the extra element changes the nature of the action so that it 
is qualitatively different from a copyright infringement 
claim." Wrench, 256 F.3d at 456. To determine whether a 
state law claim is qualitatively different from a copyright 
claim--that is, whether the state claim has an "extra ele-
ment"--courts generally examine both the elements of the 
state law cause of action and the way the plaintiff has actually 
pled that cause of action. See id. at 456-58 (explaining that 
breach of contract claim is ordinarily not preempted because 
it requires extra element of breach of promise to pay for 
author's work, but preemption applies where plaintiff alleges 
only breach of promise to refrain from reproducing, perform-
ing, distributing, or displaying work); Summit Mach. Tool 
Mfg. Corp. v. Victor CNC Sys., Inc., 7 F.3d 1434, 1441-42 (9th 
Cir. 1993) (observing that whether state law misappropriation 
claim was preempted depended on facts alleged--e.g., claim 
for misappropriation of time and labor expended in develop-
ing idea would be preempted, but claim for misappropriation 
of fruits of plaintiff's labor by marketing plaintiff's product 
under defendant's name would not). With these standards in 
mind, we consider the three claims the district court found 
preempted by copyright law.

 Count Six, the intentional interference with contract claim, 
alleges that Demetriou "had knowledge of the contract" be-

tween Sturdza and the UAE and "intentionally interfered" 
with that contract. First Am. Compl. p p 85-86. Count Six 
incorporates by reference Count One, which in turn alleges 
that "[d]uring ... [the UAE's] negotiations with [Sturdza] in 
connection with the performance of its agreement with ... 
[her], ... [the] UAE entered into an architectural services 
agreement with ... Demetriou ... without justification and 
without notice to plaintiff[,]" and that the UAE breached its 
agreement with Sturdza by among other things failing to 
execute a final contract and awarding the contract to Deme-
triou. See id. p p 59-60. Under D.C. law, tortious interfer-
ence with contract has four elements: "(1) existence of a 
contract, (2) knowledge of the contract, (3) intentional pro-
curement of its breach by the defendant, and (4) damages 
resulting from the breach." Sorrells v. Garfinckel's, Brooks 
Bros., Miller & Rhoads, Inc., 565 A.2d 285, 289 (D.C. 1989) 
(internal quotation marks and citation omitted).

 The district court would have been entirely correct had 
Sturdza claimed only that Demetriou, by copying her design, 
"intentional[ly] procur[ed] [the] breach," that is, caused the 
UAE to cancel its contract with her. Such a claim would not 
differ qualitatively from a copyright claim because both would 
rest on Demetriou's unauthorized copying--"an act which in 
and of itself would infringe on one of th[e] exclusive rights" 
protected by the Copyright Act. Harper & Row, 723 F.2d at 
200. Although tortious interference with contract claims are 
typically found preempted for this very reason, see 1 Nimmer 
& Nimmer, supra p. 9, s 1.01[B][1][a], at 1-17 to 1-19 and 
n.73.1, a different result is warranted where the defendant 
interferes with the plaintiff's contractual rights through con-
duct other than "reproduction[,] ... preparation[,] ... distri-
bution[,] ... performance[,] ... or display" of the copyright-
ed work, 17 U.S.C. s 106. This is just such a case. As pled, 
the core of Sturdza's tortious interference with contract claim 
is her allegation that Demetriou, knowing the UAE had 
agreed to award the embassy contract to Sturdza, entered 
into his own contract with the UAE to build the embassy. 
True, Sturdza also alleges that the design Demetriou con-
tracted to use infringes hers. But Count Six does not rise or 

fall on this allegation. Even if Demetriou's design were 
entirely his own, Sturdza could proceed on her tortious 
interference with contract claim based on her other allega-
tions. Because Sturdza's claim differs qualitatively from her 
copyright infringement claim, it is not preempted.

 Sturdza's intentional infliction of emotional distress claim, 
Count Seven, alleges that Demetriou's "acts as alleged herein 
were undertaken intentionally, beyond the bounds of all de-
cency and with reckless disregard of the consequences, i.e., 
injury to plaintiff, especially since defendants knew how many 
years plaintiff had devoted to the Embassy project and how 
important this project was to her." First Am. Compl. p 90. 
Count Seven incorporates Sturdza's other allegations, includ-
ing Count Six (tortious interference with contract) and Count 
One (breach of contract); the latter alleges that "[a]s a result 
of defendant UAE's breach of contract, plaintiff has suffered 
damages, including severe emotional distress." Id. p 61. In 
the District of Columbia, intentional infliction of emotional 
distress has three elements: "(1) extreme and outrageous 
conduct on the part of the defendant which (2) intentionally or 
recklessly (3) causes the plaintiff severe emotional distress." 
Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984) (internal 
quotation marks and citation omitted).

 Had Sturdza alleged that Demetriou's "extreme and outra-
geous conduct" consisted solely of stealing her design, her 
claim would be preempted, for the core of such a claim would 
not differ qualitatively from a copyright infringement claim. 
But by incorporating Counts One and Six into Count Seven 
and expressly referencing infliction of emotional distress, the 
amended complaint premises Sturdza's emotional distress 
claim on the UAE's breach of contract and Demetriou's 
procurement of that breach through conduct other than the 
"reproduction[,] ... preparation[,] ... distribution[,] ... per-
formance[,] ... or display," 17 U.S.C. s 106, of her design. 
Because Sturdza's intentional infliction of emotional distress 
claim is thus qualitatively different from her copyright claim, 
it is not preempted.

 Count Five, the conspiracy to commit fraud claim, alleges 
that Demetriou "engaged in a concerted pattern of activity in 
furtherance of the scheme which was intended to and ulti-
mately did defraud plaintiff"--a scheme whereby the UAE 
"intentionally and knowingly ... misrepresent[ed] [to Sturd-
za] ... that it had entered into a contract with her for the 
construction of the Embassy." First Am. Compl. p p 81-83. 
In the District of Columbia, "a cause of action for civil 
conspiracy must allege the formation and operation of the 
conspiracy, wrongful acts done in furtherance of the common 
scheme, and damages suffered as a result." Higgs v. Higgs, 
472 A.2d 875, 877 (D.C. 1984). "It is not necessary to aver 
facts against an alleged conspirator that satisfy all of the 
elements of fraud." Id.

 Like Counts Six and Seven, Count Five rests on more than 
Demetriou's alleged unauthorized copying of Sturdza's design. 
Because Count Five defines the fraudulent scheme in terms 
of the UAE's misrepresentations regarding the status of its 
contract with Sturdza, and because it incorporates the com-
plaint's other allegations, the count can be fairly read to 
allege that Demetriou "further[ed] ... the [UAE's fraudu-
lent] scheme" by entering into his own negotiations and 
contract with the UAE to design the embassy while knowing 
all along that the UAE had contracted with Sturdza to 
perform the very same work. Thus, Count Five is qualita-
tively different from Sturdza's copyright claim and not 
preempted.

 In reaching this latter conclusion, we express no opinion as 
to whether the conspiracy to commit fraud claim could sur-
vive a motion for judgment on the pleadings. See Fed. R. 
Civ. P. 12(c); see also Fed. R. Civ. P. 9(b) ("In all averments 
of fraud ... the circumstances constituting fraud ... shall be 
stated with particularity."); Hayduk v. Lanna, 775 F.2d 441, 
443 (1st Cir. 1985) ("[I]n actions alleging conspiracy to de-
fraud or conceal, the particularity requirements of Rule 9(b) 
must be met."). Demetriou neither made such a motion in 
the district court nor presents the argument here.

 We conclude with an observation about all three tort 
claims. As Sturdza herself points out, the claims "depend[ ] 
only on Demetriou's participation in UAE's breach of contract 
and violation of the rights and expectations that Ms. Sturdza 
had as a result of UAE's conduct towards her." Appellant's 
Br. at 30; see also Deoudes v. G.B. Macke Corp., 153 A.2d 
309, 310 (D.C. 1959) (holding that the "core" of a tortious 
interference with contract claim "is that one who intentionally 
induces another to break a valid contract is liable" (emphasis 
added)). Accordingly, should the D.C. Court of Appeals 
answer the certified question affirmatively, thus barring 
Sturdza's contract claim against the UAE, the district court 
will need to consider the implications of that decision for 
Sturdza's ability to pursue her tort claims against Demetriou.

 VI.

 This brings us finally to the district court's Rule 12(b)(6) 
dismissal of Count Eight, which alleges that the UAE, in 
violation of 42 U.S.C. s 1985, "conspired to violate ... [Sturd-
za's] property and contract rights because ... [the] UAE did 
not wish to have a female chief architect for the construction 
of the Embassy." First Am. Compl. p 105. Section 1985 
makes it unlawful for "two or more persons in any State ... 
[to] conspire ... for the purpose of depriving, either directly 
or indirectly, any person or class of persons of the equal 
protection of the laws, or of equal privileges and immunities 
under the laws." 42 U.S.C. s 1985(3). The district court, 
noting that the liability of a foreign sovereign under section 
1985 is a novel issue--only one court has even discussed it, 
see Rios v. Marshall, 530 F. Supp. 351, 372 n.22 (S.D.N.Y. 
1981) (stating in dicta that foreign sovereigns are not "per-
sons" for purposes of federal civil rights statutes)--concluded 
that such an entity is not a "person" within the meaning of 
the statute.

 Section 1985 contains no definition of "person." See 42 
U.S.C. s 1985. The Dictionary Act defines "person" for 
purposes of "determining the meaning of any Act of Con-

gress, unless the context indicates otherwise," as including 
"corporations, companies, associations, firms, partnerships, 
societies, and joint stock companies, as well as individuals." 1 
U.S.C. s 1. The Act does not expressly mention foreign 
sovereigns. See id. The Supreme Court, moreover, has 
"repeatedly held that the word 'person' in a statute does not 
include a sovereign government absent affirmative evidence 
of such an inclusory intent." Al Fayed v. CIA, 229 F.3d 272, 
274 (D.C. Cir. 2000) (citing cases). In addition to the statuto-
ry text, such evidence includes "the purpose, the subject 
matter, the context, the legislative history, [or] the executive 
interpretation of the statute." Int'l Primate Prot. League v. 
Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 83 (1991) (inter-
nal quotation marks and citation omitted) (alteration in origi-
nal); see also, e.g., Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 
313-20 (1978) (finding foreign government to be "person" 
entitled to sue under Sherman Anti-Trust Act based on 
evidence of Congressional intent that term have "broad ... 
meaning" and that Act have "expansive remedial purpose"). 
Sturdza points to neither legislative history nor any other 
evidence suggesting that Congress intended section 1985 to 
cover foreign governments. Indeed, the Supreme Court has 
held that a foreign government is not a " 'person' as that term 
is used in s 1983," Breard v. Greene, 523 U.S. 371, 378 (1998), 
and sections 1983 and 1985 are interpreted consistently with 
each other, see Owens v. Haas, 601 F.2d 1242, 1247 (2d Cir. 
1979). Sturdza points out that the term "person" as used in 
section 1985 and related provisions of the Civil Rights Act has 
been interpreted to include municipalities, see, e.g., LeBlanc-
Sternberg v. Village of Airmont, 67 F.3d 412, 426-27 (2d Cir. 
1995), but that is because "the legislative history of the Civil 
Rights Act of 1871 compels the conclusion that Congress did 
intend municipalities and other local government units to be 
included among those persons to whom s 1983 applies," 
Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 
690 (1978). For all of these reasons, we agree with the 
district court that a foreign government is not a "person" 
within the meaning of section 1985.

 VII.

 The motion to dismiss this appeal is denied. The grant of 
summary judgment for Demetriou and the UAE on Sturdza's 
copyright claim is reversed. The Rule 12(b)(6) dismissal of Counts Five, 
Six, and Seven (the tort claims) as to Demetriou is also reversed. The
Rule 12(b)(6) dismissal of Sturdza's section 1985 claim is affirmed. The 
question whether D.C. law bars Sturdza's contract and quan-
tum meruit claims is certified to the District of Columbia Court of Appeals, 
and all further proceedings in this matter shall be held in abeyance
pending further order of this court. 

 So ordered.

Karen LeCraft Henderson, Circuit Judge, concurring:

 I concur in the majority's holding that the question of 
substantial similarity under the Copyright Act must be sub-
mitted to the jury--but do so only reluctantly. I believe, as 
did the district court, that, when properly compared, Deme-
triou's final design and Sturdza's contest design are not 
substantially similar. By properly compared I mean without 
regard to Demtriou's 1993 contest submission (the appear-
ance of which cannot possibly be relevant to whether the two 
designs compared here are substantially similar to each oth-
er) and with due regard for the prevalence in both designs of 
the unprotectible commonplaces of Islamic architecture iden-
tified by the district court, namely, "domes, wind-towers, 
parapets, arches, and Islamic patterns." Sturdza v. United 
Arab Emirates, No. 98-2051, slip op. at 12. Viewed in this 
light, the two designs are more notable for their differences 
than for their similarities; the expression in each of the 
common unprotectible ideas is, as the district court described 
it, "decidedly different." Id. at 13-15. Nevertheless, given 
the degree of subjectivity inherent in assessing substantial 
similarity, I cannot say, as a matter of law, that no reasonable 
juror could find the two designs are substantially similar. 
Accordingly, I join in the majority's disposition of the Copy-
right Act claim as I do in its resolution of the other issues 
raised.

 

 

 Appendices A through E not available electronically.